IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Danielle S. King, *et al.* | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | CIVIL NO. SKG-11-1482 |
| | | |
| Eastern Shore Water, LLC., | | |
| *et al.* | * | |
| Defendants | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>MEMORANDUM OPINION</u>

Plaintiffs, Danielle King, Latasha Johnson, Marquito Purnell, and Linda Turner, four African American former employees of defendant, Eastern Shore Water, LLC. ("ESW"), filed an employment discrimination suit against ESW, J&A Bottleless Water Cooler, Inc. ("J&A"), and Joseph Aita, the president and sole owner of both companies, stating three counts: race discrimination under 42 U.S.C. § 1981 against all defendants, breach of contract against ESW, and a claim for joint and several injunctive relief against all defendants. (ECF No. 8). Presently before the Court is defendants' motion for summary judgment on the first count, for dismissal under F. Rule Civ. P. 12(b)(6) on the latter counts, and for dismissal of J&A as a defendant. (ECF No. 24).  Briefing is complete.  Neither party requested a hearing.  None is necessary. <u>See</u> Local Rule 105.6.

For the reasons set forth below, the Court (1) DENIES
defendants' motion to dismiss J&A as a defendant, (2) GRANTS
defendants' motion for summary judgment and for dismissal of the
breach of contract claim, and (3) DENIES plaintiffs' request for
injunctive relief.

**I.   Facts**

The Court shall set forth the facts presented by the parties
in the light most favorable to plaintiffs, the non-moving party.
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
587 (1986).  The facts are, however, largely undisputed.[1]  What
is disputed is the intention of the defendants in the actions
they took and what, if any, inferences of discriminatory animus
can be reasonably drawn from the facts.

**A. Background of business structure**

Between 1996 and 2010, ESW was a small, closely held Maryland
Corporation (ECF No. 24, Ex. 8, MSJ 781)[2] that sold new
residential water treatment systems manufactured by Rainsoft.
(ECF No. 24, Ex. 35, 42). ESW also sold service maintenance on
and upgrades to existing Rainsoft systems. (ECF No. 24, Ex. 35,

---

[1] Throughout the opinion, the Court shall note the rare instances
where disputes of fact exist, and analyze the significance
(<u>i.e.</u>, materiality) of those disputes.

[2] Defendants have not provided page numbers for this exhibit and
several others.  Where no page numbers are provided, the Court
will refer to the bates stamp numbers found on the relevant
pages of exhibits.

77-78; Id., Ex. 35, 107).[3]  Defendant Joseph Aita was the
president and sole stockholder of ESW. (ECF No. 24, Ex. 40, 280-
81; Id., Ex. 9, MSJ 785).  As president, Aita made all decisions
on behalf of ESW. (ECF No. 24, Ex. 40, 147).

        J&A is also a small, closely held Maryland corporation.
(ECF No. 24, Ex. 10, MSJ 791).  J&A is in the business of
selling or leasing bottleless water cooler systems, primarily to
commercial customers, via door-to-door sales. (ECF No. 24, Ex.
10, MSJ 789; Id., Ex. 40, 169, 171).  In 2010, certain ESW
employees did work for both J&A and ESW simultaneously, even
though J&A did not have any official employees. (ECF No. 24, Ex.
40, 41-47, 284). In January 2011, all ESW's operations were
transferred to J&A, and J&A now performs service work on
existing water treatment systems and upgrades those systems.
(ECF No. 24-1, 8, ¶2).

     Throughout the relevant time period in this case, ESW
consisted of four departments: telemarketing, sales, office, and
service. (ECF No. 24, Ex. 40, 57).  Each ESW department is
described in turn.

     Telemarketers called potential residential customers in an
attempt to schedule appointments for sales representatives to go

_____

[3] Upgrades occur where customers who already purchased the
Rainsoft water treatment system upgrade from a manual to
electric system. (ECF No. 24, Ex. 35, 107).

to their homes and conduct a free water test, while attempting to sell a Rainsoft water treatment system. (ECF No. 24, Ex. 40, 74; ECF No. 24, Ex. 35, 41-42).  Telemarketers also called potential customers, scheduled appointments, re-set appointments, and dispatched appointments (i.e., sent sales representatives out for appointments). (ECF No. 24, Ex. 35, 43). Telemarketers were paid an hourly rate, plus commissions and bonuses. (EFC No. 24, Ex. 35, 44; Id., Ex. 40, 65).  Commissions were based on the number of appointments in a given week that resulted in an actual sale (i.e., commissions were only given when an appointment resulted in installation of a Rainsoft water treatment system). (ECF No. 24, Ex. 40, 283; Id., Ex. 34, 35-37). For ESW's core, consistent group of telemarketers (including plaintiffs Johnson, Purnell and King), commissions were $50 for a first sale, $75 for a second sale, and $100 for a third sale in a week, after which point all commissions would be $100 per week plus a $100 bonus. (ECF No. 34, Ex. 40, 158; Id., Ex. 38, 24-25).[4]  Telemarketers generally worked part time, typically in the evenings, starting around 4:00 or 4:30 pm and

---

[4] It appears that, prior to 2005 or 2006, telemarketers were paid less in commission (the first sale per week was $30, the second sale per week was $40, and the third sale per week was $50, at which point all sales paid $50 for the rest of the week plus a $100 bonus).  (ECF No. 24, Ex. 40, 157-58; Id., Ex. 38, 24-25). In any case, the same commission structure was applied to all telemarketer. (ECF No. 24, Ex. 38, 24-25).

ending around 8:30 or 9:00 pm, and on some Saturdays. (ECF No. 24, Ex. 40, 130; Id., Ex. 34, 66; Id., Ex. 38, 23-24, 25-27, 30; Id., Ex. 34, 40-41, 60-61; Id., Ex. 35, 43-44).

Sales representatives visited potential customers' homes during the times scheduled by telemarketers, conducted free water tests, and did the actual selling of the system. (ECF No. 24, Ex. 40, 74; Id., Ex. 35, 46). Sales representatives' commissions depended on the type of water treatment system sold, and were only paid when a system was actually installed and paid for. (ECF No. 24, Ex. 40, 91).

The customer service department (referred to by plaintiffs as "up front" or the "front office") (e.g., ECF No. 24, Ex. 35, 71, 84; Id., Ex. 37, 29, 40; Id., Ex. 38, 33)) performed a variety of duties, including scheduling maintenance appointments (see discussion of service representatives' duties below), dispatching service, arranging financing for the purchase of the water treatment systems, submitting documents to finance companies, preparing payroll, preparing correspondence, preparing schedules, running errands, answering incoming telephone calls, selling upgrades to existing water treatment systems, entering data into the computer, and completing warranty cards. (ECF No. 24, Ex. 40, 9-10, 143-44, 198).  The customer service department was very small, consisting of at most three employees. (ECF No. 24, Ex. 36, 61).  Tracy Layton

and Jody Neal worked in this department (e.g., ECF No. 24, Ex. 40, 7-8); Jody Neal was the office manager. (ECF No. 24, Ex. 40, 297). The customer service department left for the day around four or five o'clock. (ECF No. 24, Ex. 40, 121). Sometimes, customer service employees were still in the office when the telemarketers would arrive in the evening. (ECF No. 24, Ex. 40, 121).

Service technicians visited customers' homes on appointments scheduled by Turner or Tracy Layton (and later Johnson), and performed maintenance on the water treatment systems pursuant to a maintenance plan sold by the service technician. (ECF No. 24, Ex. 36, 77-78). Service technicians also installed newly purchased water treatment systems and installed system upgrades. (ECF No. 24, Ex. 35, 77, 107). In addition to an hourly rate, service technicians were paid commission for upgrades and service maintenance plan sales. (ECF No. 24, Ex. 40, 255; ECF No. 24-1, 10, ¶6). Service technicians came into the building in the morning, picked up their service calls, left around 10 a.m. to go on appointments, and did not return to the office. (ECF No. 24, Ex. 40, 121).

There was also a separate office with a single desk reserved for an employee to make service maintenance appointments only. (ECF No. 24, Ex. 35, 50). As discussed below, Turner worked in this office. (ECF No. 24, Ex. 35, 50; Id., Ex. 37, 40).

Notably, and somewhat confusingly, plaintiffs refer to both the telemarketing office and the service maintenance office where Turner worked as the "back room" or "back office." (E.g., ECF No. 24, Ex. 35, 71, 84; Id., Ex. 36, 5, 7; Id., Ex. 37, 65; Id., Ex. 38, 32).[5]

## B. ESW's decline of business

Beginning with the 2005 enactment of the "do not call list," and continuing through 2010, ESW's sales of new water treatment systems diminished severely, causing the company to suffer significant loss of sales and profits. (ECF No. 24, Ex. 30, 112-13; Id., Ex. 11, MSJ 793; Id., Ex. 13; Id., Ex. 14; Id., Ex. 15).

In the beginning, around the year 1999 or 2000, ESW averaged 30-35 new sales every month, bringing in about $1.8 million to $2 million in gross sales. (ECF No. 24, Ex. 40, 117).  During that time, the company averaged between 360 to 400 new sales per year.  (ECF No. 24, Ex. 40, 117).

As business declined, however, ESW averaged 20 or 25 new sales per month, making only $800,000 per year. (ECF NO. 24, Ex.

_____

[5] The "front office" was separated from the telemarketing room by a hallway. (ECF No. 24, Ex. 38, 32; Id., Ex. 35, 121). Along the hallway, there were three or four offices in between the front room and the telemarketing room, (ECF No. 24, Ex. 38, 32), presumably including the service maintenance room where Turner worked, and another office where an employee named Chris Brewster worked. (See ECF No. 24, Ex. 36, 50-53; Id., Ex. 37, 40).

40, 117-18).  In 2007, ESW began losing its core group of sales representatives who had been there for years. (ECF No. 24, Ex. 40, 117).

Aita tried to rebuild the business on two occasions—once in 2008 and again in 2009-2010, but these attempts failed, and ESW almost went out of business. (ECF No. 24, Ex. 40, 114-15). In his attempts to save the business, Aita contributed large sums of personal money to the business (including money from his retirement accounts and his children's college funds), mortgaged his home, and refinanced his properties. (ECF No. 24, Ex. 40, 261-62). In the summer of 2010, Aita concluded that ESW could not be saved. (ECF No. 24, Ex. 40, 115).  At that time, Eric Morris was the only remaining salesperson and Latasha Johnson was the only remaining telemarketer. (ECF No. 24, Ex. 40, 116). Aita shut the telemarketing department down in December 2010 (when Morris quit), and has not hired another telemarketer since. (ECF No. 24, Ex. 40, 70, 116-17).

## C. Plaintiffs' work history

Latasha Johnson, an African American woman, was hired by ESW as a telemarketer in 2003. (ECF No. 24, Ex. 35, 40, 43). Johnson's duties generally included calling appointments, scheduling appointments, re-setting appointments, and dispatching appointments. (ECF No. 24, Ex. 35, 43).  Initially, she worked Monday through Friday, from 4:30 p.m. to 9:00 p.m.,

and Saturdays from 9:00 a.m. to noon, (ECF No. 24, Ex. 35, 43-44), and made $9 per hour plus commissions. (ECF No. 24, Ex. 35, 44). In 2005, she began working full time. (ECF No. 24, Ex. 35, 43). As a full time employee, she worked Monday through Friday from 9:00 a.m. until 1:00 p.m., and then again from 4:30 p.m. to 9:00 p.m., plus Saturdays from 9:00 a.m. to noon. (ECF No. 24, Ex. 35, 66-67). She also claims she worked between 1:00 p.m. and 4:30 p.m. (ECF No. 24, Ex. 35, 67-69). At the end of 2007 or the beginning of 2008, Johnson was promoted to supervisor of the telemarketing department, and her hourly rate increased to $12.50. (ECF No. 35, 81, 89). Johnson supervised both white and African American telemarketers. (ECF No. 24, Ex. 35, 89). In 2010, Johnson's schedule changed again. She began working Mondays and Wednesdays from 9:30 a.m. to 1:30 p.m., during which time she called to make service maintenance appointments, and between 3:30 p.m. and 7:30 p.m. she made calls to schedule initial sale appointments. (ECF No. 24, Ex. 35, 69; Id., Ex. 36, 5). She also worked Tuesdays and Thursdays between 11:30 a.m. and 7:30 p.m., and Friday between 9:30 a.m. and 5:30 p.m. (ECF No. 24, Ex. 35, 69). Johnson was terminated on January 17, 2011, (ECF No. 24, Ex. 28), after Aita shut down ESW's telemarketing department.

Marquito Purnell, also an African American female,[6] was hired by ESW as a part-time telemarketer sometime around 2003. (ECF No. 24, Ex. 34, 31-32). At that point, she worked Monday through Friday, and some Saturdays, at a rate of $9 per hour, plus commissions. (ECF No. 24, Ex. 34, 33-34). She left the company at some point[7] in the hopes of finding something better. (ECF No. 24, Ex. 34, 37). She came back at the beginning of 2007, again to a part-time telemarketing position. (ECF No. 24, Ex. 34, 38). When she returned to work in 2007, she worked Mondays through Fridays from 4:00 p.m. to 9:00 p.m. in the evening at a rate of $10 per hour plus commission. (ECF No. 24, Ex. 34, 40-41). She also worked Saturdays from 9:00 to 12:00. (ECF No. 24, Ex. 34, 60-61). That schedule continued through 2008 and 2009. (ECF No. 24, Ex. 34, 60-61). Purnell was terminated on March 1, 2009. (ECF No. 24, Ex. 2, MSJ 532).

Danielle King, also an African American female, was hired by ESW as a telemarketer in 2003. (ECF No. 24, Ex. 38, 19). From 2003-2004 King worked part time Monday through Friday from 4:30 p.m. to 9:00 p.m., and Saturdays from 9:00 a.m. to noon. (ECF No. 24, Ex. 38, 23-24). During that time, she was paid $9 per hour, plus commission. (ECF No. 24, Ex. 38, 24, 28). King

---

[6] Purnell and Johnson are sisters. (ECF No. 24, Ex. 36, 57).

[7] The record contains no evidence of when Purnell left ESW the first time.

became full time in 2005, at which time her hourly rate became $10 an hour. (ECF No. 24, Ex. 38, 23, 28).   In 2005, she worked from 9:00 a.m. to 1:00 p.m., and again from 4:30 p.m. to 9:00 p.m., Mondays through Fridays.  (ECF No. 24, Ex. 38, 25-27). King maintains that Aita terminated her in either 2004 or 2005, (ECF No. 24, Ex. 38, 67, 73), but Johnson stated that King was rehired the very next day or the same week. (ECF No. 24, Ex. 35, 55). At some point in 2007, King came in during the evenings from 4:00 to 9:00. (ECF No. 24, Ex. 38, 25-27).   King was again terminated in November 2007 for calling someone on the "do not call list." (ECF No. 24, Ex. 38, 21, 78).  She came back to ESW again in November 2010, after Aita called her and asked her to return. (ECF No. 24, Ex. 38, at 22, 35; Id., Ex. 39, 124). Through 2010, she worked from 4:00 p.m. to 9:00 p.m. (ECF No. 24, Ex. 38, 30). King was ultimately laid off on June 6, 2010. (ECF No. 24, Ex. 38, 22; Id., Ex. 2, MSJ 530).

   Linda Turner, also an African American female, worked part-time at ESW from May 2, 2006 until November 4, 2007 and then again from January 21, 2008 until approximately March 1, 2009. (Ex. 26, Ex. K, 1). She worked in a separate office by herself making calls to schedule service maintenance appointments. (ECF No. 24, Ex. 37, 31).  Turner worked Mondays through Thursdays from 4:00 p.m. until 8:00 p.m. or from 4:30 p.m. to 8:30 p.m. (ECF No. 24, Ex. 37, 30).  She was paid $9 per hour, plus

commissions, which she was paid when she scheduled a service appointment and that service was completed. (ECF No. 24, Ex. 37, 32). Turner was laid off on or about March 1, 2009. (ECF No. 24, Ex. 2, MSJ 532).[8]

Further facts are discussed below in the context of plaintiffs' claims.

## II.  Legal Standard

Summary judgment under Fed. R. Civ. P. 56 is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The only facts that are properly considered "material" are those that might affect the outcome of the case under the governing law.  Id. The party moving for summary judgment has the burden of demonstrating the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(a); Pulliam Inv. Co. v. Cameo Props., 810 F.2d 1282, 1286 (4th Cir. 1987).

When considering a motion for summary judgment, the court views all facts and makes all reasonable inferences in the light most favorable to the non-moving party. Matsushita Elec. Indus.

---

[8] Turner testified that she was terminated in February 2009. (ECF No. 24, Ex. 37, 28).

Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The non-
moving party must show that specific, material facts exist to
create a genuine, triable issue. Id.; see also Celotex Corp. v.
Catrett, 477 U.S. 317, 324 (1986).  A non-moving party "cannot
create genuine issue of fact through mere speculation or the
building of one inference upon another." Beale v. Hardy, 769
F.2d 213, 214 (4th Cir. 1985).  Further, a plaintiff cannot
proceed to trial without "any significant probative evidence
tending to support the complaint." First Nat'l Bank of Arizona
v. Cities Service Co., 391 U.S. 253, 288-89 (1968).  On those
issues for which the non-moving party has the burden of proof,
it is his or her responsibility to oppose the motion for summary
judgment with affidavits or other admissible evidence specified
in the rule. Fed. R. Civ. P. 56(c); Mitchell v. Data Gen. Corp.,
12 F.3d 1310, 1315-16 (4th Cir. 1993).  If a party fails to make
a showing sufficient to establish the existence of an essential
element on which that party will bear the burden of proof at
trial, summary judgment is proper. Celotex, 477 U.S. at 322-23.

The role of the Court at the summary judgment stage is not to
"weigh the evidence and determine the truth of the matter," but
rather to determine whether "there are any genuine factual
issues that can properly be resolved only by a finder of fact
because they may be resolved in favor of either party." Anderson
v. Liberty Lobby, 477 U.S. 242, 249-50 (1986).  The issue is

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson at 251-52. A court has an affirmative duty to prevent factually unsupported claims and defenses from proceeding to trial. Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).

If the Court concludes that a reasonable jury could not return a verdict for the plaintiffs based on the evidence in the record, summary judgment is warranted. Evans v. Technologies App. & Serv. Co., 80 F.3d 954, 958 (4th Cir. 1996), indeed compelled. Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993).

**III. Discussion**

Before discussing defendants' arguments on the merits in light of the record, the Court shall address defendants' request **to** strike certain evidence that plaintiffs provided in opposition to the defendants' motion.

Each plaintiff submitted an affidavit as an exhibit to plaintiffs' opposition to summary judgment (ECF No. 26, Ex. D; Id., Ex. H; Id., Ex. J; Id., Ex. K). Defendants object to several statements made in plaintiffs' affidavits, arguing that the Court should disregard them and/or impose sanctions on plaintiffs in accordance with Fed. R. Civ. P. 56(h). (ECF No. 27-1, 8-9; ECF No. 29, 2).

14

First, defendants challenge two statements on the ground that they change or supplement plaintiffs' deposition testimony and answers to interrogatories in "significant, material and striking ways." (ECF No. 27-1, 8).  The Court disagrees, and declines to strike these statements.  The first statement challenged is Johnson's claim that "Mr. Aita said that he didn't want the (black) backroom employees to be able to use the internet to look at pornography or to look up information about hair extensions or hair weaves." (ECF No. 26, Ex. D, 3). As discussed above, Turner's affidavit adopted this statement by asserting personal knowledge of all statements made in Johnson's affidavit. (ECF No. 26, Ex. K, 2). The Court will address this statement in its hostile work environment and disparate terms/conditions analyses below. (See Parts III(B)(ii)-(iii)). Defendants cite no law to suggest that admission of this statement post filing of a summary judgment motion was improper, and the Court is aware of none. Under what is known as the "sham affidavit rule, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that *flatly contradicts* that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Barwick v. Celotex Corp., 736 F.2d 946 960 (4th Cir. 1984).  That rule does not apply here.  The

15

alleged statement does not flatly contradict anything in plaintiffs' complaint, answers to interrogatories, or depositions.  In fact, the statement is closely related to other, previously made, assertions made by plaintiffs (e.g., that Aita inquired whether plaintiffs' hair was real or fake, and that Aita denied plaintiffs internet access).  The Court will not disregard the statement.  The second statements that plaintiffs challenge as changing/supplementing plaintiffs' former testimony are as follows.  Johnson and Purnell state that "[i]t made many of us uncomfortable watching him sexually harassing other Black girls, talking sexually, showing his chest, asking them to feel his muscles and, on more than one occasions [sic], *touching his penis*." (ECF No. 26, Ex. D, 5; Id., Ex. H, 2) (emphasis added). Defendants interpret this statement as a factual assertion that "Aita asked *them* to touch his penis," (ECF No. 27-1, 8 n.4) (emphasis added), and argue that such an assertion appeared for the first time in plaintiffs' affidavits.  However, defendants have misinterpreted the statement.  Plaintiffs did make a factual assertion in their answers to interrogatories and depositions that Aita scratched his genitals in front of them and declared that he had "jock itch." (see discussion of this claim infra, Part III(B)(ii)(a)). The affidavit statement describes the same incident, with slightly different language, and is congruently read as "[i]t

16

made many of us uncomfortable watching *him* . . . touching *his* penis."

Defendants also challenge certain statements as legal conclusions beyond the scope of plaintiffs' personal knowledge. (ECF No. 29, 2). First, Johnson states that ESW and J&A were integrated enterprises. The Court agrees that this is a legal rather than factual conclusion, and (as discussed above) will strike the statement. Next, Johnson states Aita's "two payroll scheme . . . enabled [ESW] to walk away from old liabilities including pension liabilities, long-term workers' compensation liabilities, and long-terms liabilities for future medical care." (ECF No. 24, D, 6). The Court agrees that those are legal conclusions, and highly speculative and inflammatory at that, and will strike them. In any case, it is not clear what *claim* those allegations go to.[9]

The Court does not find Rule 56(h) sanctions appropriate in this case. That rule provides that

> if satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court— after notice and a reasonable time to respond—may order the submitting party to pay the other party the reasonable expenses, including attorney's fee, it incurred as a result. An offending party or attorney may

---

[9] While the Court will not strike the plaintiffs' affidavits, the Court obviously considered only the facts in those affidavits and ignored legal conclusions and patent speculation.

> also be held in contempt or subjected to
> other appropriate sanctions.

Fed. R. Civ. P. 56(h)(the predecessor to 56(h) was 56(g); the renumbering in addition to several amendments occurred December 1, 2010). In a thorough review of case law under Rule 56(h) (of which very little exists), the U.S. District Court for the Northern District of West Virginia discussed the few cases in which courts have found bad faith. Horton v. Dobbs, 2011 U.S. Dist. LEXIS 53960, at *6-8 (N.D. W. Va. May 19, 2011). In those cases, bad faith was found where parties' submitted affidavits in an express effort to prolong litigation or with deliberate and calculated misrepresentations. Id. By contrast, no bad faith was found where affidavits were neither egregious nor entirely unwarranted, and did not contain any perjurious falsehoods. Id. at *8. As a threshold matter, nothing indicates that the affidavits at issue here were submitted solely for delay. Again, the challenged statements do not contradict former testimony. The legal conclusions made by Johnson in her affidavit do not arise to the level of bad faith. The statements are neither egregious nor entirely unwarranted.

Now the Court turns to defendants' arguments in support of their motions to dismiss or for summary judgment.

### A. J&A Bottleless Waters should not be dismissed as a defendant.

The complaint states that J&A and ESW operated as "integrated enterprises." (ECF No. 8, 3, ¶7).[10] Defendants deny this allegation in their answers to the complaint. (ECF No. 14, 3, ¶7). In support of their motion for summary judgment, defendants argue that J&A should be dismissed as a defendant because it was not the plaintiffs' employer. (ECF No. 24-1, 50-51).

Plaintiffs counter this argument, setting forth the factors used to determine whether two companies operate as integrated enterprises, (ECF No. 26-1, 9), and alleging that ESW and J&A met several of these criteria. (ECF No. 8, 3, ¶7). Defendants fail to explicitly address plaintiffs' integrated enterprise argument at all, other than to deem it "irrelevant" in passing, without any supporting precedent. (ECF No. 27-1, 8).

---

[10] The integrated enterprise theory, also referred to as the "joint employer," theory serves a dual purpose in employment discrimination cases: (1) to meet the statutory definition of "employer" under 42 U.S.C. § 2000e(b)(requiring at least fifteen employees), by adding employees of the two enterprises together; and (2) to extend liability to a defendant that does not "formally employ" a plaintiff. See Sanford v. Main Street Baptist Church, 449 Fed. Appx. 488, 491 (6th Cir. 2011) ("Entities that do not otherwise meet the definition of employer (either because they do not formally employ the plaintiff or do not meet the numerosity requirement) may still face liability through the single-employer or joint-employer doctrines."); see also Newell v. Runnels, 407 Md. 578 (Md. 2009) (explaining that the "joint employer" doctrine as applied in a Fair Labor Standards Act and Maryland Wage and Hour Law context can serve to "assess  whether an entity that lacked formal control nevertheless exercised functional control over a worker").

The Fourth Circuit has applied the integrated enterprise test when defining "employer" in Title VII cases. See Johnson v. Flowers Indus., 814 F.2d 978 (4th Cir. 1987). Although the Fourth Circuit has not explicitly stated that the integrated enterprise analysis applies in § 1981 cases, the Court will presume that is does, as the elements required to establish a discrimination case under § 1981 are generally the same as those required under Title VII. Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004); see also Chambers v. Ashley Furniture Indus., 2010 U.S. Dist. LEXIS 126969 (W.D.N.C. Nov. 9, 2010) (applying integrated enterprise theory where plaintiffs brought, inter alia, both Title VII and § 1981 claims).

In Thomas v. BET Sound-Stage Restaurant/Brettco, Inc., this Court explained that:

> In determining whether sufficient integration exists to treat the corporations as a single, integrated "employer," the Court must weigh four factors. The factors are (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control. The first three factors are weighed more heavily than the last.
>
> In applying the integrated enterprise test, courts have noted the following to be probative evidence that one company employs the other's employees for purposes of Title VII liability: (1) one company's employees hired and fired the other's employees and/or authorized lay offs, recalls, and promotions of such employees; (2) one company routinely

transferred employees between it and the
other company, used the same work force,
and/or handled the other's payroll; (3) one
company exercises more than general
oversight of the other's operations by
supervising the other's daily operations,
such as production, distribution,
purchasing, marketing, advertising, and
accounts receivable; (4) the companies have
common management in the form of
interlocking boards of directors and/or
common officers and managers; (5) the
companies fail to observe basic formalities
like keeping separate books and holding
separate shareholder and board meetings; (6)
the companies fail to maintain separate bank
accounts; [and] (7) the companies file joint
tax returns.

61 F. Supp. 2d 448, 456 (D. Md. 1999) (internal citations and

quotations omitted).  "The determination of whether two separate

and distinct corporate entities may be regarded as a single

employer under the integrated enterprise theory is thus a

question of fact to be decided in light of the above factors."

Bonomo v. National Duckpin Bowling Congress, Inc., 469 F. Supp.

467, 471 (D. Md. 1979).  Plaintiffs have alleged several of the

relevant factors, specifically, (1) common ownership/control

(ECF No. 8, 3, ¶7) (both ESW and J&A are "owned and controlled

by . . . Aita"); (2) mixed payrolls (ECF No. 8, 3, ¶7)

("[p]ayments to employees are sometimes made from one . . .

company and sometimes made from the other");[11] and (3) transfer

---

[11] At various points in their opposition to summary judgment,
plaintiffs also state that Aita paid plaintiffs in cash in order
to avoid taxes and "cheat[] the Internal Revenue Service." (See

of employees between companies (ECF No. 26-1, 9-10)

("transferring employees to J&A . . . and continuing to operate under the same management, out of the same work place and in the same business area").[12]  Defendants themselves state that Aita is "the sole stockholder and President" of both companies, (ECF No. 24-1, 8, ¶¶1-2), and that prior to January 1, 2011 (when all ESW operations were transferred to J&A), "certain [ESW] employees did work for J&A and [ESW] simultaneously[.]" (ECF No. 24-1, 8, ¶2).  Plaintiffs' allegation that they received checks from J&A is supported by deposition testimony.  Purnell testified that she sometimes received J&A checks and sometimes received ESW checks. (ECF No. 24, Ex. 34, 70, 85).  Johnson also testified that she received checks from J&A. (ECF No. 24, Ex. 35, 152).  Turner stated that she received commission checks from J&A on

---

ECF No. 30, 3, ¶4; ECF No. 26-1, 3).  However, the complaint contains no *legal claim* associated with this statement. (See ECF No. 8).

[12]  In an affidavit attached to plaintiffs' opposition to summary judgment, Johnson stated that "[ESW and J&A] were integrated enterprises." (ECF No. 26, Ec. D, 6).  Defendants argue that this is a legal conclusion that is beyond the scope of Johnson's personal knowledge, and that should be stricken under Fed. R. Civ. P. 56(c)(4) ("An affidavit . . . used to support or oppose a motion must be made on personal knowledge[.]").  The Court agrees, and will disregard this evidence.  By the same token, the Court will not consider defendant's bald statement that Turner admitted that J&A was not her employer, as the question of who constitutes an "employer" is, in this context, a legal issue.

two occasions—one in 2007 and another in 2008. (ECF No. 24, Ex. 37, 47-48).[13]

To prevail on summary judgment, defendants have the burden of showing that plaintiffs' factual allegations fail to raise a material dispute of fact regarding J&A's status as plaintiffs' employer. Defendants must do so in accordance with Rule 56(c)(1),[14] which defendants have not.

---

[13] This Court recently held that "a company's apparent issuance of one paycheck to an employee and the presence of another company's address on an employee's business card are insufficient as a matter of law to show that these two employers are integrated with an employee's immediate employer." Tasciyan v. Med. Numerics, 2011 U.S. Dist. LEXIS 141360 (D. Md. Dec. 6, 2011). Evidence supporting a theory of integrated enterprise in this case is much stronger.

[14] Rule 56(c)(1) provides as follows:

> A party asserting that a fact cannot be . . . genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

The only arguments defendants make in support of J&A's dismissal are as follows.  First, defendants state that plaintiffs (in both their complaint and their depositions) identify ESW as their employer.  (ECF No. 24-1, 50-51).  While in their amended complaint, plaintiffs assert that they were "former employees of the Defendant Eastern Shore Water," (ECF No. 8, ¶9), the amended complaint also clearly alleges that ESW and J&A "operated as an integrated enterprise." (ECF No. 8, ¶7). Next, and without providing a single citation to the record, defendants assert that "Turner specifically stated that she never worked for J&A[,]" that "[a]ll [p]laintiffs received W-2 forms from Eastern Shore Water[,]" and that "[u]ntil January 1, 2011, J&A did not have any employees." (ECF No. 24-1, 51). Those arguments fail to establish that no dispute of material fact exists with regard to J&A's status as plaintiffs' employer. The fact that plaintiffs consider ESW to be their employer and that J&A was never plaintiffs' *official* employer (on paper) does not show that J&A *was not* plaintiffs' employer as a matter of law for § 1981 purposes under a concept such as the integrated enterprise theory, or otherwise.

Having failed to demonstrate that there are no material disputes as to fact as to J&A's employer status, J&A is not entitled to be dismissed as a defendant in this case.

**B. Plaintiffs have not shown that defendants discriminated against them on the basis of their race in violation of 42 U.S.C. § 1981.**

Plaintiffs allege that defendants violated 42 U.S.C. § 1981 by: maintaining a hostile work environment (ECF No. 8, 3), and employing racially disparate treatment practices.  (ECF No. 8, 3-4).  The alleged practices of racially disparate treatment include: disparate terms, conditions, benefits and privileges of employment (ECF No. 8, 4-5); disparate termination (ECF No. 8, 4-5); and disparate promotion (ECF No. 8, 4; ECF No. 26-1, 12).

For reasons set forth below, the Court concludes that no reasonable jury could find merit in any of these claims. Before proceeding to the merits of the claims, however, the Court will address a statute of limitations issue raised by defendants in support of their motion for summary judgment.

### i. Statute of Limitations

Defendants argue that plaintiffs' claims concerning acts that occurred prior to June 1, 2007 (four years prior to the filing of plaintiffs' initial complaint) are barred by the statute of limitations associated with 42 U.S.C. § 1981 claims. (ECF No. 24-1, 38).

In relevant part, 42 U.S.C. § 1981 provides as follows:

> (a) Statement of equal rights
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give

> evidence, and to the full and equal benefit
> of all laws and proceedings for the security
> of persons and property as is enjoyed by
> white citizens, and shall be subject to like
> punishment, pains, penalties, taxes,
> licenses, and exactions of every kind, and
> to no other.

42 U.S.C. § 1981(a).  In 1991, the statute was amended

as follows to define the term "make and enforce

contracts":

> (b) "Make and enforce contracts" defined
> For purposes of this section, the term "make
> and enforce contracts" includes the making,
> performance, modification, and *termination
> of contracts, and the enjoyment of all
> benefits, privileges, terms, and conditions
> of the contractual relationship.*

42 U.S.C. § 1981(b); see Jones v. R.R. Donnelley & Sons Co., 541

U.S. 369, 373 (2004).  Prior to the 1991 addition, the statute

did not protect against conduct occurring *after the formation of

a contract*, Jones, 541 U.S. at 373, i.e., after an employee was

hired.  The 1991 amendment allows plaintiffs to sue for conduct

occurring after hiring, including termination and actions

occurring within the course of employment. However, claims

arising under the 1991 amendment are governed by the four year

statute of limitations set forth in 28 U.S.C. § 1658. Id. at

382.

Plaintiffs' claims for hostile work environment, disparate

treatment, and breach of contract all clearly occurred post-

hiring.  Thus, they fall under the 1991 amendment and are

subject to the four year statute of limitations.  The question thus becomes: what *specific* June 1, 2007 conduct and claims are barred?  Unfortunately, defendants do not specifically state which claims are barred (see ECF No. 24-1, 38).  Plaintiffs, in turn, have failed to respond to defendants' statute of limitations argument altogether.  Further, plaintiffs provide *virtually no dates* in their complaint, answers to interrogatories, or opposition to the pending motion.  The Court has thus reviewed the entire record to determine defendants' conduct within the four year statute of limitation period.

Where no dates provided anywhere in the record or it is simply unclear whether an action occurred prior to June 1, 2007, the Court will (in viewing the facts in a light most favorable to plaintiffs) assume that the events occurred after June 1, 2007.  Similarly, where evidence suggests that an event occurred sometime in 2007 but the evidence does not indicate *when* in 2007 it occurred, the Court will presume that the event occurred after June 1, 2007. Where evidence shows that an alleged event did occur prior to June 1, 2007, and because plaintiffs have not provided the Court with any argument on this issue at all, the Court will not include the events in its analyses below.

### ii. Claims

While is abundantly clear that the plaintiffs were unhappy about their jobs and working conditions and that Aita may not

have been the most professional and easy-to-get-along-with boss,
there is no evidence of a hostile work environment nor disparate
treatment based on plaintiffs' race sufficient to submit these
claims to a jury.  The Court shall discuss the two claims in
turn.

### a. Hostile Work Environment

Plaintiffs allege that the following forms of harassment
led to a hostile work environment: Aita's repeated racially
offensive comments and behavior towards plaintiffs; Aita's
repeated sexually offensive comments and behavior towards
plaintiffs; and Aita's improper touching of the plaintiffs. (ECF
No. 8, 3).

The elements of a *prima facie* hostile work environment claim
are the same under § 1981 as they are under Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Spriggs v.
Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001).  To avoid
summary judgment, plaintiffs must establish that Aita's alleged
harassment was "(1) unwelcome; (2) based on race; and (3)
sufficiently severe or pervasive to alter the conditions of
employment and create an abusive atmosphere." Id. at 183.
Additionally, "even if the record supports the conclusion that a
triable issue exists with regard to each of these three
elements, [plaintiffs] may not prevail absent sufficient
evidence of a fourth element: that there is some basis for

imposing liability on [the defendants]." Id. at 184 (internal quotation marks omitted).

Even assuming that the alleged harassment in the case at bar was both unwelcome and attributable to defendants, plaintiffs have failed to establish a *prima facie* claim of hostile work environment because (1) plaintiffs have failed to show that the alleged harassment was based on their race, and (2) viewed collectively, plaintiffs' allegations of harassment were *nowhere near* the level of severity or pervasiveness required to establish a hostile work environment claim.  Below, within the analyses of these two *prima facie* elements, the Court will address the specific assertions associated with each alleged form of harassment.

### 1. Relation to Race

To prove that Aita's alleged harassment was motivated by plaintiffs' race, plaintiffs must show that "but for" their race, they would have been treated differently.  Gilliam v. South Carolina Dep't of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007).  Merely offensive or insensitive remarks cannot sustain a claim of hostile work environment. Beall v. Abbott Labs, 130 F.3d 614, 621 (4th Cir. 1977) ("Title VII simply does not guarantee freedom from insensitive remarks that do not create an objectively abusive work environment"); Hopkins v. BGE, 77 F.3d 745, 754 (4th Cir. 1996) ("Title VII was not

29

designed to create a federal remedy for all offensive language and conduct in the workplace."). The Court concludes that plaintiffs have failed to prove that, "but for" plaintiffs' race, Aita would not have made the comments and/or conducted himself in the manner discussed below.

- **Aita's shouting, use of profanity, angry behavior, and harsh threats to fire plaintiffs:**

Plaintiffs claim that, on occasions discussed below, Aita shouted at them, used profanity, behaved in an angry fashion, and/or threatened to fire them. Plaintiffs claim that Aita never acted this way towards white employees. (ECF No. 26-1, 10-11).

Purnell testified that she never wanted to confront Aita because he would get upset, and that he once slammed the door and stated "this is my business and you're going to do what the f*** I tell you to do or there's the f****** door." (ECF No. 24, Ex. 34, 189-90).

Johnson described a chaotic environment in the telemarketing department at the end of 2007 or early 2008, stating that "telemarketers" were "upset" because "[p]retty much everybody that worked there because he was—your job was pretty much threatened on a daily basis.  Get these appointments or you don't have a job." (ECF No. 24, Ex. 35, 87-88).

King described a similar situation, stating that "[w]hen we wasn't making the type of money that Joe [Aita] was used to

making for his installs, he had an attitude, and you knew when he had an attitude because he came right out and took it out on us.  Doors would be slamming . . . . banging on the table and cussing on a continuous type of basis." (ECF No. 24, Ex. 38, 71).

King also testified that Aita once stood in the telemarketing office and "told us that he could fire all of us and hire different people in there." (ECF No. 24, Ex. 38, 70). King also stated that "[i]f [she] went to [Aita] to complain, he always stressed that: 'If you don't like how I run my company, you know where the door is.'"(ECF No. 26, Ex. J, 2; see also ECF No. 24, Ex. 38, 67-68).

While perhaps harsh, offensive, and insulting, nothing indicates that those race-neutral comments/actions were discriminatory in any way. In Tawwab v. Virginia Linen Services, 729 F. Supp. 2d, 757, 775-76 (D. Md. 2010), an African American plaintiff failed to prove that "but for" his race he would not have been subject to the following comments made by the defendant, which were profane, insulting, and abusive, yet facially race-neutral: defendant called plaintiff and other employees "dumb motherf******," "incompetent motherf******," "stupid bastards," "bastards," and "dumb bitch[es]." Id. at 766, 775.  The plaintiff in Tawwab argued that although the comments were facially race-neutral, they were overwhelmingly directed

31

towards African Americans. Id.  The Court rejected plaintiff's argument pointing to evidence that the defendant was "indiscriminately abusive and belittling to all of his subordinates, *regardless of race*." Id. (emphasis added). Specifically, the Court pointed to white employees who were subjected to similar insults.[15] Id; see also Ocheltree v. Scollon Prods., 335 F.3d 325, 338 (4th Cir. 2003) ("Notably, Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of sex.") (citing Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 676 (7th Cir. 1993) (noting that there would be no cause of action for race discrimination under Title VII for a "*daily routine of race-neutral verbal abuse*") (emphasis added)) (internal citations omitted); Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 676 (7th Cir. 1993) ("[Plaintiff] would not have an action under Title VII if [Defendant] had not mixed racist comments into his daily routine of race-neutral verbal abuse."). Similarly, in Linton v. Johns Hopkins University Applied Physics Lab., this Court held that an African American

---

[15] By contrast, the Court in Tawwab held that comments made by defendant, including the following, did meet the "but for" test: defendant's reference to African Americans as "black mother******," "black bastards" and "black Fresh Princes of Bel-Air." 729 F. Supp 2d at 766, 775.  The Court reasoned that "the addition of the word 'black' to otherwise race-neutral insults is an indicator that the individual is being targeted because of his race[.]" Id. at 776.

employee's claim that her supervisor's angry and abrasive, yet "race neutral," actions towards her failed to meet the "but for" test. 2011 U.S. Dist. LEXIS 110316, at * 32-33 (D. Md. Sept. 28, 2011).  The plaintiff in that case alleged that the supervisor directed the following "race neutral actions" towards her that she did not direct towards white employees: "smack[ing] the table angrily, put[ting] her hands inches away from plaintiff's face to stop her from speaking, point[ing] at her, jump[ing] up out of her chair suddenly, lung[ing] at her, snatch[ing] things out of her hands, and shush[ing] her." Id. (internal citations omitted).  The Court rejected plaintiff's claim because plaintiff offered no evidence that the superior did not act similarly with white employees. Id. at *33.

Like the comments in Tawwab, Aita's comments were facially race-neutral. There is no evidence whatsoever that they contained racial slurs or epithets, or that they referenced race at all. As in Linton, Aita's angry behavior (e.g., slamming doors and banging on tables) was race-neutral as well.

Further, no evidence indicates that Aita's comments/behavior were directed solely at African Americans as opposed to telemarketers in general,[16] and the telemarketing

---

[16] Notably, allegations concerning Aita shouting, use of profane language, angry behavior, and threats to fire plaintiffs etc. were asserted by the three telemarketing plaintiffs—Johnson,

office often included white telemarketers.[17]  King claims that

Aita *stood in the telemarketing office* and threatened to

terminate all the telemarketers. (ECF No. 24, Ex. 38, 70).

Johnson claims that *telemarketers* were upset by this behavior.

(ECF No. 24, Ex. 35, 87-88).  As noted by defendants, (see ECF

No. 24-1, ¶52), plaintiffs have failed to identify a single

white telemarketer treated differently in this regard.[18]


- Aita's usage of the term "you people":

Plaintiffs allege that Aita referred to them as "you

people" in an offensive manner.

King claims that, during a conference meeting, Aita said

"[y]ou people are looking at me like I'm speaking f******

---

Purnell and King—but not Turner, the fourth African American
plaintiff.

[17] Plaintiffs failed to provide evidence of *when* Aita made these
types of comments, making it impossible to know which
telemarketers were employed at the time the comments were made.
However, at least one white telemarketer, Crystal Murray, was
present during much of the time relevant to plaintiffs' claims.
She worked as a part-time telemarketer between February 20, 2001
and March 5, 2006 and from November 14, 2007 to June 6, 2010.
(ECF No. 26, Ex. 2, MSJ 530).  Another white telemarketer,
Alyssa Mullins, was employed as a telemarketer from January 11,
2010 until February 21, 2010. (ECF No. 24, Ex. 2, MSJ 530).

[18] Plaintiffs attempt to create an issue of fact as to that
assertion by stating that plaintiffs' affidavits "describe
belittling and rude comments constantly being made to Black
employees but never any such comments to White employees" and by
citing "Latasha Johnson's Deposition, Vol. 1, pg. 114." (ECF No.
26-1, 10-11).  Nothing in the evidence cited by plaintiffs
identifies a white telemarketer who was treated favorably.

Chinese." (ECF No. 24, Ex.38, 70).  She was not sure when that incident occurred but it was sometime after the company moved to a new building, (ECF No. 24, Ex.38, 73-74), which occurred in 2005 (ECF No. 24, Ex. 40, 31).[19]

Plaintiffs also claim that Aita used the term "you people" in the context of criticizing President Obama.  (ECF No. 26-1, 6).  Turner claims that this happened on two separate occasions. (ECF No. 24, Ex. 37, 73-79; ECF No. 26, Ex. E, 5). Since President Obama was elected in the fall of 2008, these statements obviously occurred thereafter.  On the first occasion, Aita said "you people are going to see how much harder things are going to get around here[,]" (ECF No. 24, Ex. 37, 77), suggesting that Obama's presidency would make small businesses suffer.  Aita was standing in the hallway where he could be heard in both the telemarketing room and Turner's office, which, again, was separate from the telemarketing office. (ECF No. 24, Ex. 37, 77-78).  Turner did not specify when this occurred.  Turner alleges that, on the second occasion, Aita stood in the same position and said "[y]ou people is going to see how many of you is going to lose your jobs because of Obama." (ECF No. 24, Ex. 37, 78-79).  Purnell (ECF No. 24, Ex. 34, 100-102; ECF No. 26, Ex. A, 4-5) and Johnson

---

[19] Because it is not clear whether King meant that the incident occurred in 2005 or sometime after 2005, the Court will assume that this statement was within the statute of limitations.

(ECF No. 24, Ex. 36, 40; ECF No. 26, Ex. F, 5) also claimed that Aita made these statements.  King was not present when Aita allegedly made the comments. (ECF No. 24, Ex. 38, at 63). Purnell claims that Aita made the statements in 2009, after Obama's inauguration. (ECF No. 24, Ex. 34, 101-02).

Plaintiffs have failed to prove that Aita's use of the term "you people" was race-based in any way.  The Fourth Circuit has not analyzed the significance of the term "you people[,]" when used (as here) in a facially race-neutral context.  However, other Circuits, as well as other district courts within the Fourth Circuit, have.  In each case, courts have held that where the term "you people" does not clearly and unambiguously refer to a minority group, it is not discriminatory. See, e.g., Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 269-70 (3d Cir. 2010) (concluding that usage of term "you people" in statements that "you people don't understand how the process works," "you people don't understand the loan process," is, alone, not revealing of discriminatory animus); Alvarado v. Health Net, 1994 U.S. App. LEXIS 9123, 14-15 (9th Cir. Cal. Apr. 19, 1994) (concluding the defendant's comments such as "I don't understand you people," "[y]ou people have too many babies," and "[y]ou people drive up the cost of health insurance" are not clearly racial because "[w]e cannot know to whom [defendant] was referring: all of the employees directly under her supervision;

all those who want to do, or are already doing, marketing
analysis; all young women who have not received a college
education, or, as [plaintiff] asserts, all Hispanics."); Linton
v. Johns Hopkins Univ. Applied Physics Lab., LLC, 2011 U.S.
Dist. LEXIS 110316, at *2, *31-32 (D. Md. Sept. 28, 2011)
(granting summary judgment on African American plaintiff's
hostile work environment claim where supervisor stated, among
other comments, that "you guys have such happy kids that are so
full of life and energy," reasoning that plaintiff offered no
evidence that the comments related to race), McKoy v. United
States VA, 2008 U.S. Dist. LEXIS 106387 (E.D.N.C. Mar. 8, 2008)
("[T]he only indication of racial animosity comes from
allegations that [defendant] referred to African-Americans as
"they" or "you people," however these claims lack specificity
and a clear indication that [defendant] was, in fact, referring
to African-Americans. Such speculation is 'insufficient to
sustain an actionable Title VII claim.'"); Royster v. Costco
Wholesale Corp., 378 F. Supp. 2d 595, 607 (M.D.N.C. 2004) ("The
only name-calling evidence with which Plaintiff supports her
claim that she was being harassed based upon her race is the
fact that Spangler referred to food court employees as "you
people." This court is simply not persuaded that such a
statement raises any question of material fact as to Plaintiff's
claims because some of the food court employees were white.").

37

Moreover, courts have acknowledged that it is an ambiguous comment and "[w]ithout other allegations indicating a racist meaning, [the term "you people"] is not in and of itself racist." See, e.g., Umani v. Mich. Dep't of Corr., 432 Fed. Appx. 453, 459 (6th Cir. 2011).

In the case at bar, as in the cases above, the evidence is not clear as to whom Aita referred when he used the term "you people." However, it is unlikely that Aita intended the term to apply solely to African Americans, as plaintiffs testified that Crystal Murray was present for every alleged usage of the term. King testified that Murray was present during the conference meeting when Aita said "you people are looking at me like I'm speaking f****** Chinese." (ECF No. 24, Ex. 38, 71). Other telemarketers were present as well, including King, Johnson, and Alice Fontaine. (Id.). Thus, it is possible that "you people" referred to telemarketers in general, or perhaps to all employees present during the meeting. Turner testified that Murray (white telemarketer) was present during both alleged occasions on which Aita said "you people" in the context of criticizing President Obama. (ECF No. 24, Ex. 37, 77, 79). Turner claims that she, Johnson, and Purnell were also present on both occasions. (ECF No. 24, Ex. 37, 77, 79). Thus, the term "you people" in that context could have been a reference to all night-shift employees, or perhaps all Democrats or supporters of

President Obama.  In any event, it is no more than speculation and conjecture to say it is a race-based reference, much less racist in context.

- Aita's accusation regarding the defaced photograph of President Bush:

Purnell claims that, around the same time as the Obama comment (which occurred in 2009, after Obama's inauguration (ECF No. 24, Ex. 34, 101-02)), Aita came into the telemarketing office, and then Turner's office, and asked who had defaced a picture of President Bush that had been on Tracy Layton's desk. (ECF No. 24, Ex. 34, 105-08; ECF No. 26, Ex. A, 5).  Johnson (ECF No. 26, Ex. F, 6) and Turner (ECF No. 24, Ex. 37, 73; Id., Ex. E, 4-5) recalled the same incident.[20]  Purnell (ECF No. 26, Ex. A, 5), and Turner (ECF No. 24, Ex. 37, 71-72; ECF No. 26, Ex. E, 4-5) claim that Aita did not ask white employees about the picture.

These allegations also fail the "but for race" test. Purnell, Johnson and Turner claim that this incident was racist. (ECF No. 24, Ex. 34, 105-08; ECF No. 26, Ex. F, 6; ECF No. 24, Ex. 37, 73).  However, plaintiffs have, again, failed to show that Aita's questioning was directed towards African American employees in particular.  First, plaintiffs offered no

---

[20] King did not mention this incident in either her answers to interrogatories (see ECF No. 26, Ex. L) or her deposition (see ECF No. 26, Ex. J).

admissible evidence that Aita did not question white employees about the incident.   In her answers to interrogatories, Turner states that Aita "did not accuse any of the White people" of defacing the photograph. (ECF No. 26, Ex. E, 4-5).   However, when asked how she knew that during her deposition, Turner said never heard Aita question white employees about the picture, and simply assumed based on Aita's personality and attitude that he did not. (ECF No. 24, Ex. 37, 71-72).   Turner's assumption based on her perception of Aita's personality is not evidence on which the Court may rely.   Similarly, when asked during her deposition how she knew Aita did not confront white employees about this, Purnell provided the following, unrelated answer: "because [Johnson] actually made a big deal out of this because this was really prejudice." (ECF No. 24, Ex. 34, 110). Second, plaintiffs have not shown that Aita's alleged interrogation was directed towards African Americans *as opposed to night-shift employees*. The damage was claimed to have occurred in the evening after the day staff went home; Aita's questioning occurred the following day. (ECF No. 24, Ex.34, 110).   Purnell testified that, sometime after Aita's questioning, Johnson confronted Tracy Layton about the incident, and Layton admitted that she "[a]ssumed that someone [in the back] did it because . . . . [the photograph] wasn't scribbled on [the day before]" and the only employees there during the time in between the day before and the morning

that Layton found the photo defaced were employees working at
night (ECF No. 24, Ex.34, 110)—i.e., telemarketers and Turner.
If true, Layton's assumption was not an unreasonable one to
make—an equally, if not more, compelling reason for Aita's
directing his inquiry to this particular group of employees.
Third, Crystal Murray, a white person, was working as a
telemarketer in 2009 when this incident allegedly occurred (ECF
No. 26, Ex. 2, MSJ 530).

- Aita's statements concerning plaintiffs' hair:

Purnell, Johnson and Turner claim that, during a Christmas
party in either 2008 or 2009, Aita asked plaintiffs whether
their hair was real or fake. (ECF No. 24, Ex. 38, 117-18; ECF
No. 24, Ex. 36, 41; ECF No. 24, Ex. 37, 70). Johnson also
testified that, on another occasion, Aita came up behind her,
put his hands on her shoulders, and asked her whether her hair
was real or fake. (ECF No. 24, Ex. 36, 41). Purnell, Johnson
and Turner all claim that they never heard Aita ask white women
such questions about their hair. (ECF No. 26, Ex. A, 5; ECF No.
26, Ex. F, 6; ECF No. 24, Ex. 37, 70; ECF No. 26, Ex. E, 5).
King was not present at any time when Aita asked African
American women about their hair. (ECF No. 24, Ex.38, 63).

In her affidavit, Johnson also claims that "Aita said that
he didn't want the (black) backroom employees to be able to use
the internet to look at pornography or to *look up information*

*about hair extensions or hair weaves.*" (ECF No. 26, Ex. D, 3)(emphasis added). [21] [22] [23] [24] Turner also stated in her affidavit that she agreed with and had personal knowledge of the statements that Johnson made in her affidavits, thus adopting Johnson's statement as to Aita's comment. (ECF No. 26, Ex. K, 2).[25]

---

[21] This statement surfaced for the first time in Johnson's affidavit; it was not made in plaintiffs' complaint, answers to interrogatories or depositions. Defendants ask the Court to disregard this information because it improperly "change[s] or supplement[s] [plaintiffs'] own deposition testimony and Answers to Interrogatories."(ECF No. 27-1, 8 n.4). As discussed above, the Court shall not strike this statement.

[22] One court described hair weaves as "[human hair that] is sewn in with [real] hair." Scott v. James, 731 A.2d 399, 401 n.4-5 (D.C. 1999). As discussed below, plaintiffs do not state how this particular type of hairstyle relates exclusively to African Americans, and the Court does not consider the use of fake hair to be an exclusively African American cosmetic technique.

[23] The use of parentheses in this sentence indicates that the word "black" is Johnson's assertion that backroom employees are black—not part of Aita's quote.

[24] Defendants explicitly deny this allegation (ECF No. 27-1, 8 n.4), thus creating a dispute of fact as to whether Aita made the statement. However the dispute is not material because, as discussed below, even assuming Aita made this statement and that the statement was racial, plaintiffs have failed to show that the statement was severe or pervasive.

[25] In their affidavits, Purnell and King state that they agreed with all the statements made by Johnson, but (unlike Turner) they did not assert personal knowledge of Johnson's statements. (ECF No. 26, Ex. H, 2; Id., Ex. J, 2). Accordingly, they are not properly considered.

Neither of the two types of statements (Aita's inquiries as to whether their hair was real or fake and Aita's statement that he did not want backroom employees "to be able to use the internet . . . to *look up information about hair* extensions or hair weaves" is racial. (ECF No. 26, Ex. D, 3).  In Fisher v. Md. Dep't of Pub. Safety & Corr. Servs., 2010 U.S. Dist. LEXIS 68772 (D. Md. July 8, 2010), aff'd Fisher v. Md. Dep't of Pub. Safety & Corr. Servs., 2012 U.S. App. LEXIS 706 (4th Cir. 2012), this Court rejected an African American plaintiff's claim that the following incidents (which ensued after she adopted a new "weave" hairstyle) were racial for purposes of her hostile work environment claim: white and African American co-workers teased her about her hair, touched her, and inquired as to whether her hair was real or fake, and one white co-worker pulled her hair with such severity that plaintiff sought medical treatment. Id. at *2, *4-5.  The Court reasoned that (1) plaintiff "acknowledged that none of the teasing or taunting about her hair involved any racial epithets or references to her race[,]" (2) plaintiff "has not demonstrated that her co-workers would have treated a white person with a similarly interesting or unusual hairstyle any differently[,]" and (3) plaintiff "acknowledged that African-American officers and employees asked the same type of questions about her hair as white officers asked." Id. at *4-5.  Thus, the Court noted that "[i]t appears

43

that any harassment that took place was motivated by Plaintiff's
hairstyle, not her race." Id. at *5.  Unlike Fisher, this case
contains no evidence that African American employees commented
on plaintiffs' hair. However, the Fisher Court's first two lines
of reasoning apply with equal force to the case at bar. None of
the comments explicitly referred to plaintiffs' race. Plaintiffs
do not assert that Aita used the word "black" or "African
American" in his comments about plaintiffs' hair. Plaintiffs
have not shown that Aita did not direct similar comments towards
a white woman with a similar, unusual hairstyle.  Plaintiffs
fail to explain anywhere why they believe such comments about
fake hair are race-based (e.g., by asserting that such hair
styles are traditionally worn by African American women), much
less motivated by racial animus.

- Aita's usage of nicknames for plaintiffs:

Purnell testified that Aita called white employees by their
real names but used nicknames for black employees. (ECF No. 24,
Ex. 34, 145-46). Specifically, she claims that Aita called King
"Red Pink, [or Blue]," called Johnson "Tash" and called Purnell
"Quita." (ECF No. 24, Ex. 34, 146-47).  King also recalls that
Aita called her "Red" or "Blue" or "Pink" based on the color of
her hair, and claims that this conduct embarrassed her. (ECF No.
24, Ex. 38, 63, 70).  Turner found Aita's use of nicknames

(namely, calling King "red" or "blue" and calling Johnson "Tasha") to be offensive. (ECF No. 24, Ex. 37, 88-89, 90).

The evidence does not show that Aita's use of nicknames for plaintiffs was racial. First, Purnell admits that she did not feel that use of the nickname "Quita" was racist. (ECF No. 24, Ex. 34, 147). Further, Johnson referred to herself as "Tasha" in her deposition. (ECF No. 24, Ex. 35, 58). More importantly, Purnell does not claim that no *white* employees were given nicknames. (ECF No. 24, Ex. 34, 148). In fact, she conceded that a white employee, Anna Bauer, was referred to as "Lizzy," which is not her real name. (ECF No. 24, Ex. 34, 148-49; Id., Ex. 40, 265). Further evidence shows that Aita used nicknames for other white employees, including a white service technician, Aaron Searing, whom Aita referred to as "Zeke." (ECF No. 24, Ex. 40, 51, 101-02, 298).

- Aita's comment that his wife could not come to bed unless she had taken a shower:

King claims that in 2007, Aita came into telemarketing room and told telemarketers that his wife would not get into bed with him unless she had showered. (ECF No. 24, Ex. 38, at 40, 42). Johnson also recalls this occurrence. (ECF No. 24, Ex. 35, 142).

Clearly this comment is not racial on its face or in its meaning. It cannot even be considered racial based on who was

present for the comment.  King testified that Crystal Murray,
the white telemarketer, was present when Aita made the comment.
(ECF No. 24, Ex. 38, 42).

This alleged comment, as well as all remaining allegations
going to plaintiffs' hostile work environment (see below)
involve sexual innuendo and are not relevant to a § 1981 hostile
work environment claim involving racial harassment.[26]  The
complaint does not include an independent cause of action for
sexual harassment. (See ECF No. 8).

- Aita's announcement that he had "jock itch" while
  scratching his genital area:

Johnson testified that in 2007, Aita held a meeting during
which he continuously scratched his genital area, later blurting
out that he had jock itch. (ECF No. 24, Ex. 35, 136).  King (ECF
No. 24, Ex.38, at 40, 42) and Purnell (ECF No. 26, Ex. A, 5-6)
also recall the occurrence. Turner was not present. (ECF No. 24,
Ex. 37, 85).

This comment was clearly not racist in any way.  Again, at
least one white employee, Crystal Murray was present.  (ECF No.
24, Ex. 38, 42).  Johnson testified that, while she believed the

---

[26] "[Section] 1981 applies exclusively to racial discrimination"
and "a 'race' encompasses any identifiable class of persons who
are subjected to intentional discrimination solely because of
their ancestry or ethnic characteristics." Proa v. NRT Mid Atl.,
Inc., 618 F. Supp. 2d 447, 460 (D. Md. 2009) (internal
quotations and citations omitted).

comment was inappropriate, and wondered what Aita was "trying to do" by making the comment, she does not claim to have had any other feelings about the incident, (ECF No. 24, Ex. 35, 139), (i.e., that it was discriminatory).

- Aita's comment that a customer could test water on his "hairy balls":

Johnson claimed that King asked Johnson about a customer who wanted to have his water tested, and Aita told King to tell the customer "he can test the water on my hairy balls if he wants to." (ECF No. 24, Ex. 36, 41). King (ECF No. 24, Ex. 38, at 41, 42) and Purnell (ECF No. 24, Ex. 34, 132, 134) claim they were present for this comment. Turner claims she overheard the comment from her office. (ECF No. 24, Ex. 37, 86-87). It is not clear when this alleged statement occurred, as plaintiffs testified it occurred during different years.[27]

There is nothing racial about this comment. In fact, Turner admitted she did not consider the comment racial harassment, but she did consider it sexual harassment. (ECF No. 24, Ex. 37, 87).

_____

[27] Johnson claims Aita made this comment in November 2005. (ECF No. 24, Ex. 36, 41). King and Turner claim Aita made the comment 2006 or 2007. (ECF No. 24, Ex. 38, at 41, 42; ECF No. 24, Ex. 37, 85-87). Purnell testified that the statement was made between 2008 and 2009. (ECF No. 24, Ex. 34, 132, 134).

Again, plaintiffs have not asserted an independent claim for sexual harassment.[28]

- Aita's exposing his biceps and abdomen and inviting touching

In each plaintiff's answer to interrogatories, the following statement appears (verbatim): "On numerous occasions Joe Aita would come into the telephone room, walk around to the desk of almost every female there and ask them to touch his bicep muscles and his abdomen.  He would flex his muscles and sometimes even take off his shirt. We considered this to be sexually aggressive, inappropriate and were confused about his offensive behavior."  (ECF No. 26, Ex. A, 5; Id., Ex. E, 5; Id. Ex. F, 6; Id. Ex. L, 4; see also ECF No. 26-1, 4).

Johnson testified that Aita used to come into the telemarketing office "flexing his muscles, walking around the phone room for everybody to touch and see how hard his abs looked or how he looked in a suit[.]" (ECF No. 24, Ex. 35, 140; ECF No. 24, Ex. 36, 11).  She did not provide a timeframe for those incidents. (ECF No. 24, Ex. 35, 140).  Johnson never touched Aita's abs.  (ECF No. 24, Ex. 36, 11). She does not recall whether the other plaintiffs touched his abs. (ECF No. 24, Ex. 36, 13).  She also testified that Aita asked Johnson and

---

[28] Purnell testified that Crystal Murray may have been present, although she was not certain. (ECF No. 24, Ex. 34, 133).

the other plaintiffs to touch his *arms* on several occasions,[29] including in March 2010, and that she and the other plaintiffs touched his arms more than once. (ECF No. 24, Ex. 36, 9-10). In March 2010 when Aita walked around the telemarketing room showing off his arms, only Johnson and Murray were present. (ECF No. 24, Ex. 36, 13-14).  Johnson touched his arms on that occasion. (ECF No. 24, Ex. 36, 15).  Johnson noted another occasion when Aita entered the telemarketing room flexing and asked each person in the room to touch his arms and abs.  (ECF No. 24, Ex. 36, 15).  King and Purnell were there on that occasion, but Johnson does not remember whether Murray was present. (ECF No. 24, Ex. 36, 15).

King testified that Aita came into the telemarketing office in 2006 or 2007 and went "around the room" "pulling his shirt up and . . . asking us to touch his body parts." (ECF No. 24, Ex. 38, 40-41).  She stated that King, Johnson, Purnell, Murray, and Fontaine were present. (ECF No. 24, Ex.38, 41).  King did not touch Aita and does not know if others did because telemarketers were in cubicles, and she remained on the phone during the incidents.  (ECF No. 24, Ex. 38, 42).

Purnell testified that Aita came into the telemarketing room one or two times between 2007 and 2009 flexing and lifting

---

[29] Johnson testified that this occurred around five times. (ECF No. 24, Ex. 36, 15).

his shirt up, asking females employees to touch his bicep muscles and his abdomen. (ECF No. 24, Ex. 34, 119-128). However, Aita never approached Purnell with this behavior. (ECF No. 24, Ex. 34, 120-21).  Purnell found the behavior "just hilarious," though "unprofessional [and] offensive" as well. (ECF No. 24, Ex. 34, 122).  She stated that the following telemarketers were present during this behavior: Johnson, King, Fontaine, Murray, Mary, and Darla Hardy.  (ECF No. 24, Ex. 34, 128, 131).

Turner was not present when Aita allegedly went into the telemarketing office and asked females to touch his arm muscles and abs, but she could overhear the conversation from her office. (ECF No. 24, Ex. 37, 82).  Turner believes this occurred on two occasions at the end of 2007. (ECF No. 24, Ex. 37, 83-84).  She stated that other employees told her of another occasion in 2008 when Aita took off his shirt. (ECF No. 24, Ex. 37, 84). Aita never asked Turner to touch his arms or abs. (ECF No. 24, Ex. 34, 84).

Again, this behavior in and of itself is not racial in any way.  Plaintiffs may have considered the behavior inappropriate and sexually offensive, but, again, there is no independent cause of action for sexual harassment in this case. The Court acknowledges that sexually harassing behavior directed exclusively at minority employees can bolster a racial

harassment claim. However, plaintiffs have not shown that Aita's alleged behavior was directed at *African American* women as opposed to telemarketing women, or female employees in general. In other words, plaintiffs have not shown that the conduct would not have occurred "but for" their race.  See Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 336-337 (4th Cir. 2010) (reversing summary judgment on plaintiff's sexual harassment claim, but affirming summary judgment on plaintiff's racial harassment claim, reasoning that "a hostile work environment claim can be bolstered by relying on evidence of a workplace tainted by both sex and racial discrimination. . . . Nevertheless, there are now two distinct counts before us, and the evidence of the pervasiveness or severity of *racial* animus at the Academy is too isolated and too minimal to survive summary judgment.") (emphasis added).

First, plaintiffs offer no evidence that Aita did not act this way towards white employees outside of the telemarketing room.  Second, plaintiffs offer no evidence that Aita did not simply act this way towards all telemarketing women.  In fact, King, Purnell and Johnson all testified that Crystal Murray was present for at least some of the alleged occurrences. (ECF No. 24, Ex. 38, 41; Id., Ex. 34, 128, 131; Id., Ex. 36, 15; Id., Ex. 36, 13-14).

Further, it is not clear exactly when or how often this behavior occurred, but it is clear that it occurred only very occasionally at best over an extended period of time.  Purnell testified that it occurred one or two times between 2007 and 2009. (ECF No. 24, Ex. 34, 119-128).  Johnson testified that this occurred around five times. (ECF No. 24, Ex. 36, 15), including in March 2010. (ECF No. 24, Ex. 36, 13).   Turner believes this occurred on two occasions at the end of 2007, (ECF No. 24, Ex. 37, 83-84) and stated that other employees told her of another occasion in 2008. (ECF No. 24, Ex. 37, 84).  King testified that it occurred once in either 2006 or 2007. (ECF No. 24, Ex. 38, at 40, 41).

- Inappropriate touching

With regard to allegedly improper touching, two plaintiffs claim that Aita put his hands on them in an inappropriate way. Purnell (ECF No. 26-1, 4). King claims that Aita would sometimes come into the telemarketing room and put his hand on King's shoulder as if to say "good job," when, for example, she had the most sales. (ECF No. 24, Ex. 38, 44).  Johnson testified that during a Christmas dinner in 2010, Aita came up behind her and touched her on the middle of her upper back with one hand, getting some ointment from her recent tattoo on his hand. (ECF No. 24, Ex. 35, 141-42).  She also testified that, on another occasion, Aita came up behind her, put his hands on her

52

shoulders, and asked her whether her hair was real or fake. (ECF No. 24, Ex. 36, 41). Johnson could not recall when the latter occurred. (ECF No. 24, Ex. 36, 41). Plaintiffs have presented no evidence that this alleged conduct was based on race, and there is no independent cause of action for sexual harassment.

The remaining plaintiffs have asserted no claims of improper touching. (ECF No. 24, Ex. 34, 117; ECF No. 24, Ex. 37, 81-82).

In sum, none of the incidents that plaintiffs claim amounted to racial harassment were race-based in any way. Aita's behavior may have been crude, harsh and offensive, but civil rights statutes were not designed to protect against such behavior in the workplace. As the Supreme Court has noted, the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not becomes a 'general civility code.'" <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).

### 2. Severe or Pervasive

The Court concludes that even if the allegations above are true, viewed both individually and collectively, they are insufficiently severe or pervasive to survive summary judgment on plaintiffs' racially hostile work environment claim.

### a. Legal standard: severity/pervasiveness

To determine whether the alleged harassing conduct is "severe or pervasive," the Court must look "at all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).

Notably, "conduct that is *either* pervasive *or* severe may give rise to a hostile work environment[;] . . . even one act of harassment will suffice if it is egregious." Whitten v. Fred's, Inc., 601 F.3d 231, 243 (4th Cir. 2010) (quoting Cerros v. Steel Techs., Inc., 398 F.3d 944, 950 (7th Cir. 2005)) (emphasis added); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (noting that, while isolated incidents generally do not show an objectively hostile work environment, if a single incident is "extremely serious," it may be sufficient to state a claim).  An assessment of severity includes a "careful consideration of the social context in which particular behavior occurs and is experienced by its target." Oncale v. Sundowner Offshore Services, 523 U.S. 75, 81 (1998).  "The 'social context' must include a consideration of the alleged plaintiff's personal circumstances." B. Lindemann & D. Kadue, Workplace Harassment Law, § 19-21 (2012). In determining pervasiveness, courts must consider "the social context and the frequency of

the discriminatory conduct; its severity; whether it is
physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an
employee's work performance." Id. at § 19-24.  "Pervasiveness is
more likely to be found if the harassment emanated from more
than one individual." Id.  The elements of severity and
pervasiveness "should . . . be considered in tandem, as they are
inversely related: the more severe the incidents are the less
pervasive they need to be to create a hostile environment." B.
Lindemann & D. Kadue, Workplace Harassment Law, § 19-14 (2012).
An inquiry into severity/pervasiveness "is not, and by its
nature cannot be, a mathematically precise test." Id. at 22.

   While the severe/pervasive standard surely prohibits an
employment atmosphere that is "permeated with discriminatory
intimidation, ridicule, and insult," id. at 21 (internal
quotations omitted), it is equally clear that the standard does
not establish a "general civility code for the American
workplace." Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 80
(1998). This is because, in order to be actionable, the
harassing "conduct must be [so] extreme [as] to amount to a
change in the terms and conditions of employment." Faragher v.
City of Boca Raton, 524 U.S. 775, 788 (1998). Indeed, "simple
teasing, offhand comments, and isolated incidents (unless
extremely serious) will not amount to discriminatory changes in

the terms and conditions of employment." Id. (internal
quotations and citations omitted). As explained in EEOC v.
Sunbelt Rentals, Inc., 521 F.3d 306, 315-316 (4th Cir. Md.
2008),

> [the Fourth] circuit has likewise recognized
> that plaintiffs must clear a very high bar
> in order to satisfy the severe or pervasive
> test. Workplaces are not always
> harmonious locales, and even incidents that
> would objectively give rise to bruised or
> wounded feelings will not on that account
> satisfy the severe or pervasive standard.
> Some rolling with the punches is a fact of
> workplace life. Thus, complaints premised on
> nothing more than rude treatment by
> coworkers, callous behavior by one's
> superiors, or a routine difference of
> opinion and personality conflict with one's
> supervisor, are not actionable . . . .The
> task then on summary judgment is to identify
> situations that a reasonable jury might find
> to be so out of the ordinary as to meet the
> severe or pervasive criterion. That is,
> instances where the environment was pervaded
> with discriminatory conduct "aimed to
> humiliate, ridicule, or intimidate," thereby
> creating an abusive atmosphere.

(internal citations and quotations omitted).

A review of the case law shows the demanding nature of the
hostile work environment standard.  In the cases where courts
have found evidence of a racially hostile work environment, the
employers used direct racial epithets and statements that were
clearly discriminatory. For instance, in Spriggs v. Diamond Auto
Glass, 242 F.3d 179 (4th Cir. 2001), the Fourth Circuit allowed

an African-American plaintiff's hostile work environment claim to proceed where his supervisor on an "almost daily basis" referred to him by slurs such as "monkey," "slave," "black b***h," and "n****r." Id. at 189. In White v. FBI Waste Services, LLC, 375 F.3d 288, 297 (4th Cir. 2004), the Court deemed the following harassment severe and pervasive: a supervisor's repeatedly calling black employees "boy, jigaboo, n****r, porch monkey . . . and Zulu warrior" and stating that he "did not appreciate [an African American employee's] taking our white women," and referring to female African American' employees as "black hookers." In E.E.O.C. v. Central Wholesalers, Inc., 573 F.3d 167 (4th Cir. 2009), the court denied a defendant's motion for summary judgment where the plaintiff's coworkers used words like "n****r" in her presence "pretty much every day," called her a "black stupid b***h," and kept "blue-colored mop-head dolls in their offices . . . hanging from nooses" around their necks. Id. at 175-77.

> **b. Application of legal standards for severity/pervasiveness to case at bar**

The severity and pervasiveness of the alleged harassment in the case at bar pales in comparison to the harassment in all the cases above. *None* of the statements are facially racial at all. (See Part III(B)(ii)(a)(1), supra). Thus, a comparison of all alleged incidents of harassment to cases in which courts analyze

the severity of racial comments is unnecessary.  However, the
Court will analyze the only two statements that, in the Court's
opinion, could <u>possibly</u> be viewed as related to plaintiffs'
race: Aita's use of the term "you people" and Aita's comments
regarding plaintiffs' hair.

> **i.   Aita's alleged usage of the
> term "you people"**

The Court turns first to Aita's use of the term "you
people." In terms of severity, even if a jury were to believe
that the reference was to race, the context does not support
racial *animus* (<u>i.e.</u>, animosity or hatred towards the referenced
race).  <u>See</u> <u>Orenge v. Veneman</u>, 218 F. Supp. 2d 758, 767 (D. Md.
2002) (granting summary judgment on a racial hostile work
environment claim where supervisor told an African American
employee, *inter alia*, that "blacks are trying to get a free ride
and that eventually the Agency was going to get rid of 'you
guys' because 'you' (blacks) don't 'hold your weight',"
reasoning that no reasonable person would consider the
supervisor's statements motivated by "gender and or *racial
animus*.").  Usage of this term was neither "egregious," <u>see</u>
<u>Whitten</u>, 601 F.3d at 243, nor "extremely serious." <u>See</u> <u>Faragher</u>,
524 U.S. at788.  Plaintiffs do not claim, and nothing suggests,
that they felt "physically threaten[ed]" by the term, or that

usage of the term "interfere[d] with their work performance."
See Harris, 510 U.S. at 23.

As for pervasiveness, the Court notes that Aita used the
term "you people" on only three isolated occasions—once during a
conference meeting, and twice in the context of criticizing
Obama.  (ECF No. 24, Ex. 38, 70; Id., Ex. 37, 73-79).[30]

A reasonable jury could not consider Aita's usage of the
term "you people" severe or pervasive.  See Faragher v. City of
Boca Raton, 524 U.S. 775, 788 (1998) (noting that isolated
incidents of abusive language will generally not meet requisite
threshold of severity or pervasiveness).

### ii.  Aita's alleged comments concerning plaintiffs' hair

The Court turns next to Aita's alleged statements regarding
plaintiffs' hairstyles.  In terms of severity, even if the
comments about plaintiffs' hair *were* somehow connected to a
stereotype about African American women's hair (a connection

---

[30] Because plaintiffs do not date in any way Aita's usage of
these terms, it is impossible to know within what span of time
these statements were made.  However, even if made over a short
span of time (e.g., one month), no reasonable jury would
conclude that these statements were severe or pervasive because,
again, there is no clear connection between the term "you
people" and African Americans, and absolutely no undertones of
racial animus in Aita's alleged usage of the term.  In any
event, it is more likely that these three isolated incidents
occurred over the four year span between June 1, 2007 (the
earliest date not barred by the statute of limitations) and
January 17, 2011, when Johnson was terminated, (ECF No. 24, Ex.
28).

which, again, plaintiffs have not asserted and the Court does not understand), the comments do not evidence racial animosity or hatred. Linton, 2011 U.S. Dist. LEXIS 110316, at *31-33 (D. Md. Sept. 28, 2011)(granting summary judgment on a hostile work environment claim where a supervisor's made, *inter alia*, the following comments to an African American employee: "[Plaintiff] was so lucky that she is dark because she does not have to wear makeup at all[,]" reasoning that even though the comment "clearly relate[d] to Plaintiff's race" and was "ignorant and insensitive," the comment "by itself does not evidence *animosity*."); see also Proa v. NRT Mid Atl., Inc., 618 F. Supp. 2d 447, 464 (D. Md. 2009) (granting summary judgment on plaintiffs' racially hostile work environment claim where "many of the incidents, indeed most of the incidents, cited by plaintiffs are not remotely connected to racial animus").

Moreover, courts (both within and outside of the Fourth Circuit) have rejected *far* more egregious comments regarding ethnic stereotypes (physical and otherwise) on the basis of insufficient severity or pervasiveness. See, e.g., Li Li Manatt v. Bank of America, 339 F.3d 792, 795-99 (9th Cir. 2003) (holding that co-workers' comments to plaintiff over a span of two and a half years, such as "I am not a China man, I'm not like China man with their eyes like that," "China woman, China woman, get your butt over here," and pulling their eyes back

with their fingers in an attempt to imitate or mock the
appearance of Asians, were not severe and pervasive); Elmahdi v.
Marriott Hotel Servs., 339 F.3d 645, 652-53 (8th Cir. 2003)
(holding that, while offensive, a supervisor's references to
African American plaintiff as "boy" and "black boy" and
reference to African Americans as having big penises were not
severe or pervasive); Greene v. Swain County Partnership for
Health, 342 F. Supp. 2d 442, 454-55 (W.D.N.C. 2004) (finding
that Native American plaintiff's evidence that a co-worker used
the term "Token Indian," made derogatory comments about her
black hair and high cheekbones, and made insensitive comments
about Native American teen pregnancy rates, was insufficiently
severe and pervasive); Martin v. Merck & Co., 446 F. Supp. 2d
615, 627-630 (W.D.Va. 2006) (numerous racially offensive
comments and conduct over a span of many years, including
employees' use of the word "nigger," altering workplace poster
to include the word "nigger," displaying a racially offensive
cartoon, holding a hangman's noose, the comment that black
employee should: "go back to the jungle where he came from,"
referring to a black female employee's "unpleasant odor because
she was a black woman" was found to be insufficiently severe and
pervasive).

Any alleged comments regarding plaintiffs' hairstyles were
neither "egregious," see Whitten, 601 F.3d at 243, nor

"extremely serious." See Faragher, 524 U.S. at788.  Again, plaintiffs do not claim, and nothing suggests, that they felt "physically threaten[ed]" by the term, or that usage of the term "interfere[d] with their work performance." See Harris, 510 U.S. at 23.

As far as the frequency of Aita's comments regarding plaintiffs' hair, plaintiffs have only identified three isolated occasions—once at a Christmas party, (ECF No. 24, Ex. 38, 117-18; ECF No. 24, Ex. 36, 41; ECF No. 24, Ex. 37, 70), once to Johnson alone, (ECF No. 24, Ex. 36, 41), and once in the context of explaining why he did not want internet access in the back room. (ECF No. 26, Ex. D, 3).[31]

The remaining alleged acts of harassment are clearly not severe or frequent, and even viewed in connection with the alleged incidents above, they will not save plaintiffs' hostile work environment claim from summary judgment.  In the light most

---

[31] Again, it is impossible to know over what span these alleged comments took place because plaintiffs have not provided evidence of when the incidents occurred (with one exception—the alleged inquiry made at a Christmas party took place in either 2008 or 2009 (ECF No. 24., Ex. 36, 41; Id., Ex. 37, 70)).  Even if the incidents occurred over a very short period of time (e.g., one week), no reasonable jury could find them severe or pervasive because plaintiffs have not shown that the statements were motivated by racial animus.  Again, it is more likely that these three isolated incidents occurred over the four year span between June 1, 2007 (the earliest date not barred by the statute of limitations) and January 17, 2011, when Johnson was terminated, (ECF No. 24, Ex. 28).

favorable to plaintiffs, Aita's shouting, use of profanity,
angry behavior and threats to fire plaintiff occurred with the
following frequency: whenever telemarketers were not bringing in
"the type of money that [Aita] was used to," (ECF No. 24, Ex,
38, 71), whenever Aita was confronted or complained to, (ECF No.
24, Ex. 31, 189-90; ECF No. 24, Ex. 38, 67-68; ECF No. 26, Ex.
Ex. J, 2) "on a daily basis" at the end of 2007 or early 2008,
(ECF No. 24, Ex. 35, 87-88), and on at least one other occasion.
(ECF No. 4, Ex. 38, 70).  Plaintiffs did not provide evidence of
how frequently Aita used nicknames for them, but the evidence
indicates that he referred to both white and African American
employees by nicknames on a regular basis.  As far as
plaintiffs' claim that Aita showed off his muscles, the
plaintiffs do not demonstrate any great frequency of this
behavior. Again, Purnell testified that it occurred one or two
times between 2007 and 2009, (ECF No. 24, Ex. 34, 119-128),
Johnson testified that this occurred around five times, (ECF No.
24, Ex. 36, 15), Turner believes it occurred on two occasions at
the end of 2007, (ECF No. 24, Ex. 37, 83-84) and stated that
other employees told her of another occasion in 2008, (ECF No.
24, Ex. 37, 84), and King testified that it occurred once in
either 2006 or 2007. (ECF No. 24, Ex.38, at 40, 41).  All
remaining alleged incidents were isolated and occurred only
once: the incident involving the defaced picture of President

Bush, (ECF No. 24, Ex. 34, 105-08; ECF No. 26, Ex. F, 6; ECF No. 24, Ex. 37, 73); Aita's comment about his wife coming to bed, (ECF No. 24, Ex. 38, at 40, 42; ECF No. 24, Ex. 35, 142); Aita's announcement that he had "jock itch," (ECF No. 24, Ex. 35, 136; ECF No. 24, Ex.38, at 40, 42; ECF No. 26, Ex. A, 5-6); and Aita's "hairy balls" comment. (ECF No. 24, Ex. 36, 41; ECF No. 24, Ex. 38, at 41, 42; ECF No. 24, Ex. 34, 132, 134; ECF No. 24, Ex. 37, 86-87).

Overall, Aita's allegedly harassing conduct amounted to nothing more than "rude treatment" and "callous behavior." See Sunbelt Rentals, Inc., 521 F.3d at 315-316.  The conduct may have been unpleasant, offensive and not conducive to a professional office environment.  But the evidence does not indicate that the atmosphere at Eastern Shore Water was "permeated with discriminatory intimidation, ridicule, and insult." Id. at 21.  As this Court noted in Proa v. NRT Mid Atl., Inc., "a rude, crude and nasty . . . manager who generates an unpleasant or even miserable work environment does not necessarily translate into a § 1981 claim." 618 F. Supp. 2d 447, 464, 470-71 (D. Md. 2009) (granting summary judgment on plaintiffs' racially hostile work environment claim where a manager's alleged behavior was insufficiently severe or pervasive, noting that "[t]he ravings of a . . . manager, particularly involving such wide-ranging and generalized

outbursts . . . [failed to] supply the degree of hostility required for a hostile work environment claim."). "Title VII does not guarantee a happy workplace, only one free from unlawful discrimination." Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997).  Because no reasonable jury could find that plaintiffs suffered a racially hostile environment at ESW, summary judgment on plaintiffs' hostile work environment claims is granted.

### b. Disparate Treatment

The proof required to establish a claim for disparate treatment is the same under Title VII and § 1981. Gairola v. Virginia Dep't of General Services, 753 F.2d 1281, 1285 (4th Cir. 1985).

A plaintiff alleging discrimination under § 1981 may prove his or her case in two ways.  First, a plaintiff may offer direct evidence of discrimination that raises a genuine issue of material fact regarding whether an impermissible factor motivated the employer's adverse employment decision. See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). Second, when a plaintiff lacks any direct evidence of discrimination or retaliation, he or she may proceed using the burden-shifting proof scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 (1973).  See Proa, 618 F. Supp. 2d at 46 (noting that McDonnell Douglas

applies in § 1981 cases); <u>Love-Lane v. Martin</u>, 355 F.3d 766, 786
(4th Cir. 2004) (same).

Plaintiffs appear to proceed under both methods of proof.
Again, the <u>McDonnell Douglas</u> framework applies only if
plaintiffs lack direct evidence—otherwise, the "direct and
circumstantial" test is used.  In other words, if plaintiffs had
direct evidence, the <u>McDonnell Douglas</u> burden shifting analysis
would be superfluous. <u>See</u> Larson on Employment Discrimination §
8.07[1] ("If a plaintiff can directly present evidence of
employment discrimination, resorting to the <u>McDonnell Douglas</u>
framework is unnecessary."). Defendants argue that plaintiffs
have not presented any direct evidence.  (ECF No. 24-1, 40).
Thus, defendants have analyzed plaintiffs' case under the
<u>McDonnell Douglas</u> framework, (ECF No. 24-1, 40), as will the
Court.

The Court agrees that plaintiffs have not presented any
direct evidence of discrimination. "To survive summary judgment
on the basis of direct and indirect evidence," plaintiffs "must
produce evidence that clearly indicates a discriminatory
attitude at the workplace and must illustrate a nexus between
that negative attitude and the employment action." <u>Brinkley v.
Harbour Rec. Club</u>, 180 F.3d 598, 608 (4th Cir. 1999); <u>see also</u>
<u>Brinkley v. Harbour Recreation Club</u>, 180 F.3d 598, 608 (4th Cir.
1999) (noting that, in establishing evidence of discrimination,

derogatory remarks may constitute direct evidence, as long as the remarks were related to the employment decision in question and were not "stray or isolated."). As discussed in detail below, none of plaintiffs' evidence establishes discriminatory motive at all, let alone a clear nexus between discriminatory motive and the alleged adverse employment actions. Thus, the Court's analysis of all evidence presented by plaintiffs shall proceed under the McDonnell Douglas framework.

Under the McDonnell Douglas proof framework, plaintiffs have the initial burden of establishing an inference of discrimination.[32] See Page v. Bolger, 645 F.2d 227, 229-30 (4th Cir. 1981); Larson on Employment Discrimination, § 8-08[8]. If

---

[32] Plaintiffs can demonstrate an "inference of discrimination" by establishing a *prima facie* case for the particular type of disparate treatment alleged. The elements of a *prima facie* case vary depending on the form of disparate treatment (e.g., disparate hiring, disparate termination, disparate promotion). Typically, *prima facie* tests for various forms of discrimination adapt to the *prima facie* test used in McDonnell Douglas (a refusal to hire case), which is as follows: (1) plaintiff belongs to a racial minority; (2) plaintiff applied for a position; (3) despite plaintiff's qualifications, he/she was refused; and (4) after rejection, the position remained open and the employer continued to seek applicants. 411 U.S. at 802. For example, and as evidenced below, the Fourth Circuit's *prima facie* tests for disparate termination and disparate promotion echo that in McDonnell Douglas. *Prima facie* tests for some forms of disparate treatment, however, are not easily adaptable to the McDonnell Douglas *prima facie* test, e.g., claims of disparate compensation, benefits, and other terms, conditions, or privileges or employment. Larson on Employment Discrimination, § 8.08[9]. The overall proof scheme in McDonnell Douglas, however, still applies to such claims. Id.

plaintiffs establish an inference of discrimination, the burden
shifts to the employer to "articulate some legitimate,
nondiscriminatory reason for the employee's rejection." Id. at
802.  If the employer does so, the burden shifts back to
plaintiff to prove that the reason given by the employer was
"pretextual" (i.e., a sham to cover discriminatory motive).  Id.
at 804.  Summary judgment is proper if a plaintiff has failed to
establish a *prima facie* case or if the defendant has rebutted a
*prima facie* case and the plaintiff has failed to show pretext.

> **1. Disparate compensation, terms,
>    conditions, and privileges of
>    employment**

Title VII (and thus § 1981) renders it unlawful for an
employer "to discriminate against any individual with respect to
his compensation, terms, conditions, or privileges of
employment, because of such individual's race . . . ."  42
U.S.C. § 2000e-2(a)(1).  Plaintiffs allege that defendants
violated that provision by:

- physically segregating them from white employees and
  hiding them from customers by relegating them to a
  back room (ECF No. 8, 3, ¶ 10);

- subjecting them to inadequate heat and air
  conditioning, while white employees in the front
  office enjoyed comfortable temperatures (ECF No. 8, 3,
  ¶ 10; ECF No. 26-1, 6, ¶ E);

- denying plaintiffs access to bathroom supplies such as
  toilet paper and paper towels, to which white
  employees had access (ECF No. 26-1, 2);

- failing to offer plaintiffs adequate benefits while white employees were given such benefits without difficulty, and ultimately awarding plaintiffs the benefits on less favorable terms than offered to white employees (ECF No. 8, 4, ¶ 10);

- paying plaintiffs less commissions than white employees, and failing to correct the situation where white employees wrongfully stole plaintiffs' commissions (ECF No. 8, 4, ¶ 10);

- paying one white employee severance pay, but not plaintiffs (ECF NO. 26-1, 5, ¶C);

- denying plaintiffs the same lunch breaks that were permitted to white employees (ECF No. 8, 4, ¶ 10);

- denying plaintiffs computers with internet access for discriminatory reasons (ECF No. 26-1, 10);

- discouraging plaintiffs from bringing their significant others to company functions, while white employees were not discouraged (ECF No. 8, 4, ¶10);

- requiring plaintiffs to work sometimes without pay, without requiring white employees to work without pay (ECF No. 30, ¶¶ 3, 5);

- not permitting plaintiffs to write on their time cards while permitting front office employees to do so (ECF No. 26-1, 10; ECF No. 24, Ex. 35, 100-01); and

- not providing plaintiffs with company Blackberry cell phones, while some of the employees up front were given such phones. (ECF No. 26, Ex. 34, 147).

An inference of discrimination in cases of disparate

compensation, benefits, terms, conditions or privileges of

employment arises where a member of a protected class[33] proves

that an employer treated him or her negatively compared to that

of similarly situated employees.  Larson, § 8.08[8] ("[T]o

create an inference of discrimination [in a terms or conditions

case], it would seem to be sufficient if a plaintiff shows that

similarly situated employees not in his protected class received

more favorable treatment *vis a vis* the particular benefit or

other term or condition."

　　The Court proceeds with an analysis of each alleged form of

discriminatory term/condition of employment pursuant to the

McDonnell Douglas burden shifting scheme.  Ultimately, the Court

finds no merit in plaintiffs' disparate terms/conditions claim

because "plaintiffs fail[ed] to provide evidence that [Aita]

treated similarly situated employees who did not share their

racial characteristics differently." See Proa v. NRT Mid Atl.,

Inc., 618 F. Supp. 2d 447, 464 (D. Md. 2009).[34]

---

[33] Defendants concede that, as African Americans, plaintiffs are
members of a protected class. (ECF No. 24-1, 39).

[34] It is also not clear whether plaintiffs' claims of disparate
terms/conditions of employment, viewed individually or
collectively, amount to an "adverse employment action." See
Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir.
1985) (noting that in order to state a cause of action for
disparate treatment under Title VII, a plaintiff must allege
that (s)he suffered an "adverse employment action."); Page v.
Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (en banc)
("[I]nterlocutory or mediate decisions having no immediate
effect upon employment conditions" do not rise to the level of
"adverse employment actions."); Larson on Employment
Discrimination, § 12.01[1] ("A key inquiry in the disparate

- Physical segregation

Plaintiffs claim that, while "[w]hite employees worked in the front room where they could be seen by the customers[,] . . . [b]lack employees were relegated to a back room behind closed doors." (ECF No. 8, 3, ¶ 10).[35]

Purnell testified that, in general, telemarketers were not allowed to be up front, and sales representatives were not allowed to come to the telemarketing room in the back. (ECF No. 24, Ex. 34, 73, 75, 141).

---

treatment analysis is whether the employer's conduct qualifies as an adverse employment action covered by Title VII."). Title VII (and thus § 1981) clearly prohibits "ultimate employment decisions" such as hiring, granting leave, discharging, promoting, and compensation. Von Gunten v. Maryland, 243 F.3d 858, 866 (4th Cir. 2001). However, "it is not self-evident what is prohibited by the Title VII provisions forbidding employers 'otherwise to discriminate . . . with respect to . . . terms, conditions, or privileges of employment . . . .'" Larson on Employment Discrimination, § 12.01[1] (citing 42 U.S.C. § 2000e-2(a)(1). Because defendants have not challenged plaintiffs' disparate terms/conditions claim on this basis, the Court will assume, without deciding, that the claim satisfies that "adverse employment action" requirement. See Jensvold v. Shalala, 829 F. Supp. 131, 134-37 (D. Md. 1993), aff'd without opinion, 141 F.3d 1158 (4th Cir. 1998) (holding that plaintiff's alleged discrimination in the form of, inter alia, denial of research opportunities and training, belittlement of her work, receipt of mentoring programs that were different than male peers, and assignment of undervalued projects, constituted adverse employment action despite the fact that the actions were not "ultimate employment decisions" under Page).

[35] Defendants explain that ESW "did not have a 'store' where customers were encouraged or expected to come into the office and purchase items on a regular basis," and that '[a]lthough some customers did go to the office one or twice a month to purchase salt, this was not the norm." (ECF No. 24-1).

Turner claimed that on one occasion in or around 2006, the computer in her office broke and Tracy Layton told her to work on her computer in the front office. (ECF No. 24, Ex. 37, 93-95).  Turner stated that when Aita saw Turner on Layton's computer he questioned her about why she was there, and asked her to move to Chris Biester's office. (ECF No. 24, Ex. 37, 93-94).[36]

King claims that in 2007, Aita told telemarketers to keep their office door closed because sales representatives were coming into the telemarketing room and talking with the telemarketers. (ECF No. 24, Ex. 38, at 34-35).  Purnell also recalls that Aita asked the telemarketers to keep their door shut to keep the sales representatives out. (ECF No. 24, Ex. 34, 141).  Turner testified that in 2008 Aita placed a sign on the telemarketing door stating that the telemarketing office door must remain closed and that no one was to enter the room. (ECF No. 24, Ex. 37, 92).[37] Both King and Turner testified that the reason Aita wanted the telemarketing office door closed was because sales representatives were coming in and talking to telemarketers.[38] (ECF No. 24, Ex. 39, 131; ECF No. 24, Ex. 37,

---

[36] Chris Biester was a sales representative. (ECF No. 24, Ex. 2, MSJ 539).

[37] Turner stated that, before that time, telemarketers were not required to keep the door closed. (ECF No. 24, Ex. 37, 90).

90-92).   Turner testified that Murray, Purnell and Johnson were telemarketers when Aita imposed this new rule.  (ECF No. 24, Ex. 37, 92).   Turner testified that she was not required to keep her door closed. (ECF No. 24, Ex. 37, 90).

Turner stated that she was not aware of any African Americans who worked in a capacity where they interacted with the public. (ECF No. 24, Ex. 37, 95).

Plaintiffs have failed to raise any inference of discrimination with regard to workplace segregation because they have not shown that similarly situated non-minorities (i.e., white telemarketers) were not subject to the same requests described above.

As far as the allegation that, in general, telemarketers were expected to stay "in the back," it is crucial to note that for much of the time relevant to these claims, Crystal Murray was a telemarketer.   Again, Crystal Murray worked as a part-time

---

[38] King claims that Aita did this because sales representatives were telling telemarketers that other employees were improperly getting paid commissions on installations that stemmed from telemarketers' calls, and that telemarketers were being misled into thinking the installations had not gone through. (ECF No. 24, Ex. 39, 131).   Similarly, Turner testified that Aita imposed the new rule because one of the technicians had been coming into the telemarketing office and telling the telemarketers information about sales for which they did not receive commission. (ECF No. 24, Ex. 37, 90-92).   Turner believed the technician was interested in Crystal Murray because she was the person he gave the information to. (ECF No. 24, Ex. 37, 92-93).

telemarketer between February 20, 2001 and March 5, 2006 and from November 14, 2007 to June 6, 2010. (ECF No. 24, Ex. 2, MSJ 530).  Another white telemarketer, Alyssa Mullins, was employed as a telemarketer from January 11, 2010 until February 21, 2010. (ECF No. 24, Ex. 2).

As for Turner's claim that she was not permitted to stay up front the day her computer broke, plaintiffs have not identified a single white telemarketer who was permitted to do so under similar circumstances.

In terms of Aita's request that the door remain closed, again, Turner testified explicitly that Crystal Murray was a telemarketer when Aita imposed the rule.  (ECF No. 24, Ex. 37, 92).

Finally, the evidence overwhelmingly contradicts plaintiffs' suggestion that no African Americans at ESW interacted with the public.  ESW employed numerous African American service technicians and sales representatives, who regularly interact with the public.  For example, Karl Reddick, an African American, worked as a service technician between 1997 until 2009.  (ECF No. 26, Ex. 2; ECF No. 26-1, 15).  Lamont Roberts, who started work in the early 2000s as a service technician in the service department and later worked as a sales representative, was African American. (ECF No. 24, Ex. 40, 92). Anthony Hayward was an African American sales representative

employed between 2003 and 2008. (ECF No. 24, Ex. 40, 96-97; Id.,
Ex. 2).  Eric Morris, also African American, worked as a sales
representative between September 29, 2008 and December 2010.
(ECF No. 24, Ex. 40, 107; Id., Ex. 2).[39]  More importantly,
interacting regularly with the public is not part of ESW
telemarketing duties. (See Part I(A)). It is thus not surprising
that plaintiffs have failed to identify any white telemarketer
treated differently in this regard.

Because plaintiffs have failed completely to raise an
inference of discrimination by way of maintaining a segregated
workplace, the Court need not advance to subsequent phases of
the McDonnell Douglas test.  However, the Court does acknowledge
defendants' argument that Aita had a race-neutral reason for
asking telemarketers to close their door: "[b]ecause [Aita] was
paying hourly wages to people to make phone calls on the phone,
and [he] didn't want anybody to go in there to distract them
from doing that." (ECF No. 24, Ex. 40, 98).[40]  Not only have
plaintiffs failed to prove that this reasoning was a pretext for
discrimination—they have actually provided testimony that

---

[39] Notably, Ethel Gibbs, an African American woman, worked in the
customer service department from around 2003 to either 2005 or
2006. (ECF No. 24, Ex. 40, 102).  Fay Elzey, another African
American woman, worked in the customer service department in the
early 2000s. (ECF No. 24, Ex. 40, 104).

[40] Aita does recall discouraging sales representatives from going
to the telemarketing room and talking to the telemarketers
sometime in 2009. (ECF No. 24, Ex. 40, 97-98).

supports it (by explaining that Aita imposed the rule because sales representatives were coming into the telemarketing office and talking with telemarketers during work hours).

- Inadequate heat and air conditioning

Plaintiffs claim that "while the front room for white employees had adequate heat and air conditioning, the back room, for Black employees, did not." (ECF No. 8, 3, ¶ 10).  Without providing any specific dates,[41] plaintiffs allege that "[i]n the summer time it was not cool enough in the back room and in the winter time it was not warm enough" but "[t]he temperature in the front room was usually appropriate and healthy." (ECF No. 26-1, 2).[42]  According to plaintiffs, the heat was turned off or adjusted in the winter and the air conditioning was turned off or adjusted in the summer, when the day staff went home.  (ECF No. 26-1, 6; ECF No. 24, Ex. 37, 103).  Purnell and Johnson both complained to Tracy Layton that the temperature in the telemarketing room was uncomfortable. (ECF No. 24, Ex. 34, 142; Id., Ex. 35, 122-23).  Layton said she would speak to Aita, but never followed up with the telemarketers about the issue. (ECF No. 24, Ex. 34, 142).  Afterwards, however, Johnson came into

---

[41] At one point, Johnson did testify that such temperature disparities occurred in 2007, 2008, 2009 and 2010. (ECF No. 24, Ex. 35, 119).

[42] King, however, testified that the back was so cold in the summer that she had to bring sweaters in to work. (ECF NO. 26, Ex. 38, 45).

work one day and noticed a space heater was placed in the telemarketing office (however, the space heater did not work adequately).  (ECF No. 24, Ex. 35, 120, 123).  Johnson assumes that Layton placed the space heater in the telemarketing office. (ECF No. 24, Ex. 123).  Plaintiffs state that at some point, a locked box was installed over the thermometer, so that only a person with a key could access it. (ECF No. 24, Ex. 34, 142; ECF No. 26-1, 6). None of the plaintiffs state that they complained to Aita about this alleged disparity. (ECF No. 24, Ex. 35, 122-23; Id., Ex, 37, 97, Id., Ex. 47).  However, Aita does recall being told that it was cold in the telemarketing room (he does not recall who told him that). (ECF No. 24, Ex. 40, 83).  He states that, in response, he turned the heat up. (ECF No. 24, Ex. 40, 83).

Plaintiffs have failed to establish an inference of discrimination with respect to alleged temperature disparities. Once again, plaintiffs have not provided a single piece of evidence to indicate that African American night-shift employees suffered uncomfortable temperatures while white night-shift employees did not.[43]  Again, Crystal Murray, was a telemarketer

---

[43] In an effort to create an issue of fact as to this assertion, plaintiffs simply refer the Court to "Interrogatory Answer No. 7 of Linda Turner. Ex.E." (ECF No. 26-1, 12).  In that answer, Turner simply describes the temperature disparities within the building-she does *not* identify a white night-shift employee who was treated differently.

during most of 2006 and from November 14, 2007 to June 6, 2010.
(ECF No. 24, Ex. 2, MSJ 530).  Alyssa Mullins worked as a
telemarketer from January 11, 2010 until February 21, 2010. (ECF
No. 24, Ex. 2, MSJ 530).  Thus, white telemarketers worked
during the years that this temperature disparity allegedly
existed.  In fact, Johnson states herself that she supervised
both black telemarketers and white telemarketers over the years.
(ECF No. 26, Ec. 35, 88-89).

Turning to the second stage of the McDonnell Douglas
analysis, defendants have offered an adequate, non-
discriminatory reason for adjusting the temperature at night.
Aita acknowledged that there was limited access to the
thermostat "so that . . . not anybody just goes and cranks up
the elec – you know, the heater to 80 degrees." (ECF No. 24, Ex.
40, 83).  The reason behind this was "*to save electric*." (ECF
No. 24, Ex. 40, 84) (emphasis added). Plaintiffs have not shown,
or even attempted to show, that this reason was a mere pretext
for discriminatory motive.  In fact, Turner corroborated the
proffered reason by admitting that the purpose behind the
temperature adjustment was not to intentionally make the night
shift uncomfortable, but "to save on the electric of whatever
kind of heat it was." (ECF No. 24, Ex. 37, 103).

- Access to bathroom supplies

Plaintiffs claim that

> two white employees in the front room had
> access to paper towels and toilet paper, but
> *those who worked in the back room did not*.
> When paper supplies in the bathroom would
> run out, only these two white employees were
> able to replace the supplies because only
> they had access to the cabinet where the
> supplies were maintained.   Therefore paper
> supplies ran out after the two white
> employees had gone home, and plaintiffs were
> unable to have access to toilet paper or
> hand towels during their work day.

(ECF No. 26-1, 2) (emphasis added).  Plaintiffs have not

explained how frequently and during what time period this

occurred.  Again, this allegation fails to raise any inference

of racial discrimination because white employees worked in the

"back room" as well.  As argued by defendants (see ECF No. 24-1,

¶50), plaintiffs have not identified a single white night-shift

employee who was treated differently in this regard.  In an

attempt to create an issue of fact as to defendants' assertion

that plaintiffs did not identify such a white employee,

plaintiffs argue that the assertion is "inaccurate," citing to

Purnell's deposition and the interrogatory answers of Purnell

and Turner. (ECF No. 26-1, 10) ("This is inaccurate.  See

Deposition of Marquito Purnell, pgs. 153-155, Ex.C and her

Interrogator Answer 7 at pgs. 6 and 7, Ex. A.  Also see the

Interrogatory Answer 7 of Linda Turner. Ex.E").  However, the

evidence cited by plaintiffs fails to identify any night-shift

employee who received better treatment.

- Benefits

Next, plaintiffs allege that

> All the white employees had health insurance
> and other benefits without difficulty.
> However, plaintiffs had to persist in
> requesting the same benefits that were
> available to white people which, after much
> complaining by the plaintiffs[,] eventually
> were awarded but on less favorable terms
> than those of white people.

(ECF No. 8, 4, ¶ 10).  Because plaintiffs' claims regarding

benefits differ, the Court will analyze them separately.

**Purnell**

Purnell claims that she did not receive paid vacation. (ECF

No. 24, Ex. 34, 137).  However, Purnell was a part-time

employee, and only full-time employees were entitled to paid

vacation. (ECF No. 24, Ex. 4; ECF No. 24, Ex. 40, 130-31).  In

any case, Purnell could not identify a single white, part-time

employee who received paid vacation. (ECF No. 24, Ex. 34, 138;

ECF No. 26, Ex. A, 6).

Purnell further alleges that she asked Aita for a 401(k)[44]

plan through the company. (ECF No. 24, Ex. 34, 135).  Aita said

he would need to speak with his lawyer and get back to her. (ECF

No. 24, Ex. 34, 145). The next day Aita told Purnell that his

lawyer said she was not entitled to the plan. (ECF No. 24, Ex.

---

[44] Throughout their testimony, plaintiffs and Aita both use the
terms "401(k)" and "IRA" interchangeably. Later, Aita testified
that the company offered a simple IRA as a retirement plan, and
that there was no 401(k). (ECF No. 24, Ex. 40, 232).

34, 135).  This fails to raise any inference of discrimination because plaintiffs have not identified any white, part-time employees who received the plan. Further, plaintiffs have not even alleged that Purnell was entitled to a 401(k).  ESW employees were only entitled to a 401(k) only once they made $5,000 per year, and enrollment was offered once per year. (ECF No. 24, Ex. 40, 131, 268-69). Purnell did not controvert this factual assertion.

Purnell has no claim as to health insurance.  She testified that she had health insurance through her husband's plan, and "didn't care" whether she had health insurance through Eastern Shore Water. (ECF No. 24, Ex. 34, 136).

### Johnson

Johnson testified that, in general, she felt discriminated against because Aita did not affirmatively offer her vacation time, personal leave time or an IRA plan—she had to find out on her own whether she was eligible, and then request the benefits. (ECF No. 24, Ex. 35, 129-30).  Even if true, plaintiffs have not identified any white ESW employee who received such benefits with greater ease.

Johnson testified that she felt entitled to one week of paid vacation and five personal days in 2008 because the company handbook states that full-time employees are entitled to such benefits.  (ECF No. 24, Ex. 35, 111-16).  Johnson testified that

she did not receive those benefits in 2008.  (ECF No. 24, Ex. 35, 110, 116).[45]  However, time cards and payroll records clearly show that Johnson did receive paid vacation and paid personal time in 2008. (See ECF No. 24, 25). While this may present a dispute as to fact as to whether or not Johnson received her paid vacation and personal time, that dispute does not prevent summary judgment on her claim of disparate treatment.  Johnson has not demonstrated that white ESW employees received all paid vacation and personal leave time, according to the handbook.

Notably, Johnson concedes that she was offered the 401(k) in January 2007, at which time she signed up for it. (ECF No. 24, Ex. 35, 133, 135).

Johnson has no claim with respect to health insurance.  She testified that she had other health insurance and did not need it through ESW. (ECF No. 24, Ex. 35, 129).

**Turner**

Turner stated that she was entitled to paid vacation even though she was a part-time employee. (ECF No. 24, Ex. 37, 121). However, she was not aware of *any* other part-time employees at

---

[45] Johnson testified that she did receive 2 weeks of paid vacation and five paid personal days in 2009. (ECF No. 24, Ex. 35, 116-17). She used all of those days. (ECF No. 24, Ex. 35, 117-18). She also testified that she received two weeks of paid vacation and five personal days in 2010. (ECF No. 24, Ex. 35, 118).

Eastern Shore Water (let alone *white* part-time employees) who received paid vacation. (ECF No. 24, Ex. 37, 121-22).

Turner also testified that she felt entitled to paid holidays, but did not receive them. (ECF No. 24, Ex. 37, 122). However, she did not know of any part-time white employees that were paid for holidays. (ECF No. 24, Ex. 37, 122). Indeed, time card and payroll records show that Crystal Murray (part-time telemarketer) was not paid for holidays. (See ECF No. 24, Ex. 25, Id., Ex. 26). Notably, Turner never asked for paid vacation or paid holidays. (ECF No. 24, Ex. 37, 123).

Turner did not claim entitlement to paid sick time, and did not know of any white part-time employee who received paid sick time. (ECF No. 24, Ex. 37, 122). Turner also has no claim as to health insurance. (ECF No. 24, Ex. 37, 116). Finally, Turner never asked for a 401(k), and "it wasn't a big deal to [her] because [she] had a 401(k)" through [her other employer] . . . [a]nd [she] was only a part-time employee at Eastern Shore Water." (ECF No. 24, Ex. 37, 117).

### *King*

King claims she did not receive holiday pay, health insurance, paid sick time, or paid vacation, while white employees (Jody Neal, in particular) did. (ECF No. 24, Ex. 38, 48-49). She did not offer a timeframe as to when these alleged disparities occurred.

83

First, evidence before the Court contradicts King's testimony that she was not paid vacation.  As defendants note, records and time cards indicate that King did in fact receive pay for holidays that she did not work in 2007, including New Year's, Memorial Day, July 4th, and Labor Day. (ECF No. 24, Ex. 26).[46]  Plaintiffs do not dispute this.  In any case, plaintiffs have not identified a single white telemarketer who was paid for holidays that King was not paid for.  King points to Jody Neal, but plaintiffs provide the Court with no evidence of holidays on which Neal was paid and King was not.

As far as health insurance, King claims that in 2005, after becoming a full time employee, she asked Aita for health insurance and Aita said he would have to check with his attorney. (ECF No. 24, Ex. 38, at 50, 52).  King claims that Aita did not get back to her about health insurance, and she did not ask again. (ECF No. 24, Ex. 38, 50-52).[47]  These facts fail to raise any inference of discrimination because (other than King's unsubstantiated claim about Jody Neal) plaintiffs have

---

[46] Exhibit 26 does not contain page numbers.

[47] Aita testified that he held office-wide meetings once a month (including all departments), and when the time for renewal of health insurance arose, he would present that issue in the monthly meeting. (ECF No. 24, Ex. 40, 230-31).  During that meeting, he would let whichever employees were entitled to health insurance know that they were entitled, and discuss premiums. (ECF No. 24, Ex. 40, 231).

not offered any evidence that any white full-time employee was treated more favorably in this regard.

Similarly, plaintiffs have offered no evidence that any white employees received paid sick leave while King did not. Indeed, Turner testified that she did not know of any white part-time employee who received paid sick time. (ECF No. 24, Ex. 37, 122).

As far as paid vacation, Aita admits that up to year 2007, King did not receive paid vacation. (ECF No. 24, Ex. 40, 264). However, King was a part-time telemarketer and, as such, was not entitled to paid vacation before 2005, when she became part-time. (ECF No. 24, Ex. 4; ECF No. 24, Ex. 40, 130-31).[48]  As for the time between 2005 and 2007, plaintiffs have again failed to show that any white full-time employee (including Jody Neal) did receive paid vacation during that time.

- Commissions

Next, plaintiffs claim (1) that they were paid less in commissions than white employees, (ECF No. 8, 4, ¶10), and (2) that "[d]efendants knew that certain white employees, in the front room, would steal commissions from black employees but the

_____

[48] King's claim does not include exclusion from any IRA.  In fact King testified that she received an IRA. (ECF No. 24, Ex. 38, 48).  In 2006 or 2007, Aita let King know she was eligible for the IRA. ECF No. 24, Ex. 38, at 52.  From the end of 2006 until when she left the company in 2007, King contributed to the IRA. (ECF No. 24, Ex. 38, 53).

defendants did nothing to correct this injustice despite having been notified about it and complained to about it by the plaintiffs." (ECF No. 26-1).   Because not every plaintiff makes both claims, the Court will address each plaintiff's allegations separately.

### *Purnell*

Purnell claims that all of the ESW sales representatives received more than she received in commission, (ECF No. 24, Ex. 34, 157),  and that the following white people made more than she in commissions: Tracy Layton, Tracy Layton's husband, Lizzy, and another white woman "up front[,]" whose name she could not recall. (ECF No. 24, Ex. 34, 157, 164-65).[49]

This allegation does not support any inference of racial discrimination because the white employees that Purnell

---

[49] Purnell also claimed that "Lizzy" was given a higher hourly rate ($12 per hour) than Purnell.   (ECF No. 24, Ex. 34, 166).   Further, she alleged broadly that "*every* white employee made more" than she.   (ECF No. 24, Ex. 34, 168) (emphasis added).   Those allegations find no support in the record.   Purnell started at ESW at a rate of $9 per hour, plus commissions. (ECF No. 24, Ex. 34, 34; Id. Ex. 2, MSJ 532).   When Purnell returned to work in 2007, she was paid $10 per hour plus commission. (ECF No. 24, Ex. 34, 40-41).   Again, "Lizzy" was in the customer service department, so any comparison to a telemarketer's salary is irrelevant. (ECF No. 24, Ex. 2, MSJ 530).   In any case, the evidence indicates that "Lizzy" made $10 per hour. (Id.). Tracy Layton, who also worked in the front office, made $7 per hour. (ECF No. 24, Ex. 2, MSJ 549).   As far as telemarketing rates, the evidence indicates that white telemarketer Alyssa Mullins was paid $8 per hour, (ECF No. 24, Ex. 2, MSJ 530), and white telemarketer Crystal Murray was paid $10 per hour. (ECF No. 24, Ex. 34, 40-41).

identified are not telemarketers, and are thus not "similarly situated." First, a comparison to all sales representatives is meaningless because Purnell was strictly a telemarketer. Similarly, both Tracy Layton and "Lizzy," whose real name is Anna Bauer (ECF No. 24, Ex. 40, 265), worked in the front office—not in telemarketing. (ECF No. 24, Ex. 34, 167). The unidentified white woman "up front" apparently worked in the front office as well. Tracy Layton's husband, Donald Campbell, was a service technician, (ECF No. 24, Ex. 40, 105-06), so any comparison to him is equally irrelevant. Purnell could not identify a white telemarketer who was paid more in commission than she was. (ECF No. 24, Ex. 34, 163-64).

Purnell also claims that her sale commissions were stolen by Tracy Layton sometime in 2007 and again in 2009. (ECF No. 24, Ex. 34, 41-42, 55). Each time, Purnell set the appointment, and it was later re-set by Layton, who received commission for it. (ECF No. 24, Ex. 34, 43, 56). However, Purnell never informed anyone besides Johnson of her complaint. (ECF No. 24, Ex. 34, 57). In any event, Purnell has not identified a white employee who faced similar frustrations but was treated more favorably.

***King***

King does not claim that she was paid less in commission than white employees. When asked about the factual assertion in the complaint that she was paid less in commission than white

persons, she stated "I'm not sure if I was paid less [commission] or not . . . there's no way that I have of knowing that" (ECF No. 24, Ex. 38, at 54).[50] In fact, King testified in her deposition that all telemarketers received the same commission in 2003, 2004, 2005, 2006, 2007. (ECF No. 24, Ex. 38, 24-25).  King also does not claim that white employees stole commissions from her. (ECF No. 24, Ex. 38, 57).

**Johnson**

Johnson claims that in August 2007, Tracy Layton told her that she (Layton) received between $200 and $250 per commission for selling water system upgrades to customers, depending on what the upgrade sold for. (ECF No. 24, Ex. 35, 106-09). Johnson complains that, by contrast, she was not paid commission for an upgrade when, in the midst of scheduling service appointments, she "actually got maybe like three or four people to say they were going to talk to the service guy when he got there about upgrading their system after I had a conversation with them about it." (ECF No. 24, Ex. 36, 107).  First, Johnson presents no evidence that those conversations resulted in actual sales.  Tracy Layton only received a commission if an upgrade was actually sold. (ECF No. 24, Ex. 40, 255).  Second, it appears that Johnson has confused upgrade commissions with

---

[50] See also (ECF No. 24, Ex. 39, 128) ("I don't know if [Tracy Layton] was paid more commission than I was.").

service maintenance commissions. Aita only paid upgrade commissions to customer service representatives and sales representatives for selling upgrades. (ECF No. 24, Ex. 40, 255-56). Tracy Layton was a customer service representative. Johnson did not sell upgrades—she scheduled service appointments. (See Part I(C) and discussion below). In this scenario, Johnson was scheduling a maintenance appointment—not selling an upgrade. Aita did not give upgrade commissions to employees for scheduling service appointments. (ECF No. 24, Ex. 40, 255-56).

Next, Johnson claims that Tracy Layton was paid commission for scheduling service maintenance appointments while she (Johnson) was not. The evidence suggests otherwise.  Time cards from 2008 show that Tracy Layton was paid commissions for upgrades but was not paid commissions for scheduling service maintenance appointments. (ECF No. 24, Ex. 27).[51] Customer service representatives, like Layton, scheduled service maintenance appointments during the daytime. (See Part I(A)). Until 2009, Turner scheduled service maintenance appointments on

---

[51] No page numbers are provided within Exhibit 27.  Defendants also cite to ECF No. 24, Ex. 27 (showing some of Layton's time sheets during 2009) and ECF No. 24, Ex. 21, 22, 23 and 24 (lengthy documents showing company payroll records for years 2007, 2008, 2009, and 2010, respectively) as evidence that Layton was paid commissions for upgrades but not service maintenance.  Unfortunately, those exhibits contain no page numbers, and defendants cite to none.  The Court does not see how those submissions support the proposition for which they were cited, and defendants provide no explanation.

a part-time basis during the evening. (See Part I(C)). After
Turner left in 2009 and Johnson and Layton took over her
responsibilities, Johnson also began scheduling service
maintenance appointments during the daytime. (See Part I(C); ECF
No. 24, Ex. 35, 69; ECF No. 24, Ex. 35, 69; ECF No. 24, Ex. 36,
50-51).  Aita paid commissions for scheduling service
maintenance appointments during the *evening*, but not during the
*daytime*. (ECF No. 24, Ex. 40, 127-28).  That is why he
terminated Turner—because her service maintenance scheduling
duties could be performed by other employees during the daytime,
when he would not have to pay commission. (Id.).  In any case,
plaintiffs have not identified a single white employee who was
paid commissions for scheduling service maintenance appointments
during the day.

    As far as stolen commissions, Johnson claims that Jody Neal
was paid on one of Johnson's sales.  (ECF No. 24, Ex. 36, 17).
Johnson scheduled an appointment, and Neal later claimed credit
for the sale because the customer was her neighbor. (ECF No. 24,
Ex. 36, 17). Neal was paid on the commission, and Johnson had to
show Aita her referral paperwork to prove the commission was
hers. (ECF No. 24, Ex. 36, 18). Johnson was paid the commission
at that point. (ECF No. 24, Ex. 36, 18).  However, Johnson felt
it was unfair that she had to document her claim to the
commission, while Jody did not. (ECF No. 24, Ex. 36, 18).  This

allegation raises no inference of discrimination because plaintiffs have not offered any proof that Aita did not question Jody Neal as well.  In fact, Johnson admits that she "[could not] speak on" the question of whether Aita also asked Neal to defend her claim because "[she] wasn't there." (ECF No. 24, Ex. 36, 18).

**Turner**

Turner does not make the claim that she was paid a lesser commission rate than white employees.  She does allege that Tracy Layton stole some commissions that she (Turner) had earned. (ECF No. 26, Ex. E, 7). Starting in November 2008, Turner noticed that she was being paid less in commission for scheduling the same number of commissions. (ECF No. 24, Ex. 37, 20-21).  As a result, she began writing down every service appointment she scheduled. (ECF No. 24, Ex. 37, 21).  Tracy Layton periodically gave Turner a list of completed services. (ECF No. 24, Ex. 37, 22).  Turner noticed that several of her scheduled services were not on the document given to her by Layton. (ECF No. 24, Ex. 37, 22). In February 2009, Turner perused company records of completed service appointments, and noticed that service some of those missing appointments had been completed. (ECF No. 24, Ex. 37, 22-23).  She was not paid commission for those services. (ECF No. 24, Ex. 37, 23). Turner believes she lost between $100 and $150 in commission.

(ECF No. 24, Ex. 37, 25).  Turner left a note pointing out these
discrepancies on Tracy Layton's desk. (ECF No. 24, Ex. 37, 23).
During Turner's exit meeting, Aita approached Turner about the
note she left on Layton's desk.  (ECF No. 24, Ex. 37, 24-25).
He said he did not believe that Layton intentionally deprived
Turner of her commissions—that it was accidental. (ECF No. 24,
Ex. 37, 25).  The next month, Aita did pay Turner for those
commissions. (ECF No. 24, Ex. 37, 25-26).  Turner's allegations
raise no inference of discrimination.  Even if Layton did steal
her commissions, Aita rectified the situation by paying them to
her and explaining that he did not believe it was intentional.
In any case, Turner (indeed, none of the plaintiffs) identified
a white employee who faced a similar situation and was treated
any better.

- Severance pay

Plaintiffs claim that defendants paid one white employee
severance pay upon termination, but not plaintiffs (ECF No. 26-
1, 5, ¶C).  Specifically, Turner claims that a white employee
named Tiffany (who worked at PNC Bank before working at Eastern
Shore Water) was given severance pay after she was fired in 2008
for watching pornography at work. (ECF No. 24, Ex. 37, 27-29).
Tiffany worked up front. (ECF No. 24, Ex. 37, 29). Turner was
not aware of *any* other employee receiving money from the company
after leaving. (ECF No. 24, Ex. 35, 29).  Purnell claims

92

similarly that Aita paid $2,700 in severance pay to "the woman . . . who worked across the street at the bank" (presumably "Tiffany," although Purnell could not recall her name). (ECF No. 24, Ex. 34, 180-81).  However, the official payroll records reveal that a person named "Riffany Curtis" was employed with the company and terminated on July 29, 2007 (ECF No. 24, Ex. 2, MSJ 539).  However, the records do not show any severance pay in the amount of $2,700 to "Tiffany," and termination of this Tiffany was a year earlier than Turner testified to.  Without evidence on the similarity of the situations of the white employee Tiffany and the plaintiffs, it would be unreasonable to draw any inference of discrimination.

- Lunch breaks

Plaintiffs claim that they were denied the paid lunch breaks that were permitted to white employees (ECF No. 8, 4, ¶ 10). Specifically, Johnson felt that she was entitled to a lunch break once she became full time in 2005.[52]  In 2010, Johnson asked Aita for a lunch break, and he told her that she should come in a half hour early to take a half hour lunch. (ECF No. 24, Ex. 35, 132).  Johnson testified that she believed Tracy's lunch break was paid because, like Johnson, she was paid for 40 hours per week and Johnson never left the office, while Layton

---

[52] Johnson never discussed this with Aita in 2005 or 2006, and she could not recall discussing it in 2007, 2008, or 2009. (ECF No. 24, Ex. 35, 131).

did. (ECF No. 24, Ex. 35, 133).  King also claims that white employees received 30 minute lunch breaks, while she did not. (ECF No. 24, Ex. 38, 55).  She did not bring this concern to Aita. (ECF No. 24, Ex. 38, 55).  Purnell and Turner do not have claims regarding lunch breaks; (ECF No. 24, Ex. 34, 186-87; ECF No. 24, Ex. 37, 128).

Again, a comparison between telemarketer schedules and Tracy Layton (who worked in customer service) is inapposite. Plaintiffs have not identified any white telemarketer who received a paid lunch break.  In any case, Aita testified that all customer service representatives worked standard hours, 8:00 a.m. to 4:30 p.m. and did *not*, in fact, get paid for 30 minutes of that time.  (ECF No. 24, Ex. 40, 128-30).  Evidence before the Court, namely, Layton's 2008-2009 time cards, support that statement.  The time cards show that Layton's typical hours were from 8:00 a.m. until 4:30 p.m., which is 8.5 hours per day, and 42.5 hours a week, but Layton was only paid for 40 hours.  (ECF No. 26, Ex. 27; Id., Ex. 28).[53]

- Denial of computers with internet access

Plaintiffs claim they were denied computers with internet access for discriminatory reasons. (ECF No. 26-1, 10).

Johnson testified that Aita asked telemarketers to obtain driving directions to customers' homes by asking the customers

---

[53] No pages numbers were provided in these documents.

for directions.  (ECF No. 24, Ex. 36, 49).  However, she claims, telemarketers found that customers could not always provide adequate directions, and wanted to use computers up front, which had internet access, to access Mapquest. (ECF No. 24, Ex. 36, 49).  Johnson claims Aita told telemarketers not to use other employees' computers, which were up front and also in the separate office of Chris Biester (which was across from Johnson's office when Johnson worked in the service office) (ECF No. 24, Ex. 36, 48-49, 52-53).[54]

The other telemarketing plaintiffs make similar claims. King testified that telemarketers needed computers to access online directions via Mapquest after scheduling appointments. (ECF No. 24, Ex. 38, 66).  According to King, this was the only reason telemarketers needed computer access.  (ECF No. 24, Ex. 38, 66).  King stated that, by contrast, sales representatives had access to computers with Mapquest.  (ECF No. 24, Ex. 38, 66).  She testified that Aita denied telemarketers' request to use a computer up front to get Mapquest directions.  (ECF No. 24, Ex. 38, 66).  Purnell also felt that telemarketers should have access to Mapquest. (ECF No. 24, Ex. 34, 143).  She stated that Aita caught Johnson up front using Mapquest on a computer, and asked telemarketers not to use those computers. (ECF No. 24,

---

[54] When Johnson moved to the service office in August 2010, there was a computer in that office, but she claims that it did not have internet access. (ECF No. 24, Ex. 36, 52).

Ex. 34, 143-44).  As a result, Purnell purchased a smart phone,
and allowed telemarketers to use it for directions. (ECF No. 24,
Ex. 34, 144).

Turner has no claim in this regard.  She testified that her
office contained all the items necessary to perform her job,
including a computer and a telephone. (ECF No. 24, Ex. 37, 31).[55]

Further, in an affidavit submitted with plaintiffs'
opposition to the motion to dismiss, Johnson claims that "Aita
said that he didn't want the (black) backroom employees to be
able to use the internet to look at pornography or to look up
information about hair extensions or hair weaves." (ECF No. 26,
Ex. D, 3).[56]  Again, Turner blanketly adopted Johnson's
statements in her affidavit. (ECF No. 26, Ex. K, 2).

Plaintiffs have, again, overlooked the fact that white
employees, including Crystal Murray and Alyssa Mullins, worked
in the telemarketing room. Thus, no discriminatory inference is
raised.  Even if plaintiffs had raised such an inference,
defendants have satisfied the second step of the McDonnell
Douglas scheme by offering a non-discriminatory reason for not
permitting telemarketers to use computers to access Mapquest:

---

[55] Turner also stated that she was permitted to use Chris
Biester's computer.  (ECF No. 24, Ex. 37, 113).

[56] It is not clear whether plaintiffs submit this evidence in
support of their hostile work environment claim or their
disparate terms/conditions claim.  Thus the Court has analyzed
the statement under both claims.

Aita believed that the telemarketing room did not need access to Mapquest because for years before Mapquest existed, telemarketers could simply get directions over the telephone. (ECF No. 24, Ex. 40, 139-40).   Plaintiffs have not presented any evidence to indicate that this reason was pretextual.

- Discouragement from bringing their significant others to company functions

Plaintiffs claim that "[b]lack employees were discouraged and sometimes forbidden from bringing their husbands or boyfriends to the company Christmas party or to other functions while [w]hite employees were not." (ECF No. 8, 4, ¶10). Plaintiffs make the following factual assertions in connection with that allegation.

In either 2003 or 2004, Johnson brought a guest to a company Christmas party (named Darron Burton). (ECF No. 24, Ex. 35, 165).   She was not asked any questions about that guest. (ECF No. 24, Ex. 35, 164). After that year, however, Aita would put sign-up sheets on the refrigerator so that employees could sign up for the Christmas parties and indicate whether they were bringing a guest. (ECF No. 24, Ex. 35, 161).   Johnson said that if she marked a guest, she had to go to Aita's office and explain who she was bringing, how old they were, and whether they would cause trouble. (ECF No. 24, Ex. 35, 162, 165).   As a result, Johnson stopped bringing guests after the year she

97

brought Burton, (ECF No. 24, Ex. 35, 163, 166), until 2010.  In 2010, Johnson stated that Aita questioned Johnson about a girl she intended to bring in 2010, Tanya Wilson. (ECF No. 24, Ex. 35, 169).  Aita asked how old the girl was (which Johnson interpreted as asking whether the guest was old enough to consume alcohol legally), and whether she would cause trouble. (ECF No. 24, Ex. 35, 169).  Johnson brought Wilson to the party anyway. (ECF No. 24, Ex. 35, 169).

Purnell went by herself to one particular Christmas dinner because after putting her husband on the sign-up sheet, Aita questioned her about him, asking what kind of person he was and whether he had been in trouble.  (ECF No. 24, Ex. 34, 195-97).

Turner testified that about one week before company events took place, there was a sheet on the refrigerator for employees to sign up and indicate whether they would be taking a guest. (ECF No. 24, Ex. 37, 130-31).  Before a December 2008 Christmas party, Purnell and Johnson told Turner that when they indicated they were bringing guests, Aita would call them to his office and ask them questions including where the person worked, what kind of attitude they had, whether they did drugs or drank alcohol, or whether they were violent. (ECF No. 24, Ex. 37, 131-32, 135-36).

Plaintiffs have failed to raise an inference of discrimination because they have not shown that white employees

with guests unknown to Aita were not questioned.  In fact, Johnson testified otherwise by admitting that Crystal Murray stated she was not going to bring her boyfriend "because [Aita] acted like it was a problem with bringing him because she is not married to him. (ECF No. 24, Ex. 35, 168; Id., Ex. 35, 14).

Even if plaintiffs had established an inference of discrimination by way of these allegations, the claim would not survive the remaining phases of the McDonnell Douglas analytical framework.  Incredibly, plaintiffs *themselves* identify the non-discriminatory reason why, if true, Aita questioned plaintiffs but not certain white employees about guests: Aita knew those white employees' significant others, but not plaintiffs' significant others.  Johnson testified that Tracy Layton was not questioned about guests because "automatically they know [that her husband,] Donald[,] is coming with her." (ECF No. 24, Ex. 35, 162).[57]  Johnson also suggested that Jody was never questioned because her husband typically showed up.  (ECF No. 24, Ex. 35, 162).  Purnell testified that white employees who put their significant others' names on the list were not questioned because "most of them was friends." (ECF No. 24, Ex.

---

[57] "Donald" refers to Donald Campbell, who worked at ESW as a service technician. (ECF No. 24, Ex. 40, 106-06).

34, 198).[58]  Turner testified that Aita did not question white

employees about guests because *Aita knew every one of the guests*

*they would bring personally*. (ECF No. 24, Ex. 37, 135-36).  For

example, Turner testified that Jody Neal and her husband were

friends with Aita, and Tracy Layton's husband, Donald, worked

for Eastern Shore Water. (ECF No. 24, Ex. 37, 135).

- Working without pay

In her answers to interrogatories, Johnson also claims

that, during certain periods between 2008 and 2011, she was not

paid for time that she worked at home (during weekdays and on

some Saturdays).  (ECF No. 26, Ex. F, 4-5).   This claim appears

to be part of Johnson's breach of contract claim (as the answer

appears under Interrogatory No. 3, regarding Johnson's breach of

contract claim), but the Court will also analyze it under her §

1981 claim as well.  In an affidavit, Johnson also claims that

> [d]uring much of my employment I worked from
> about 9:00 a.m. to about 1:00 p.m. and then
> I was off for three hours until about 4:00
> p.m. when I returned to work until 8:00 p.m.
> I was asked to make calls to customers from
> my home during three hours in the afternoon
> that I was not at work.  However, I was not
> paid for these three hours and this
> situation went on for many years.  I was
> asked to do work during the three afternoon
> hours that I was not paid and I should have
> been paid.  Moreover, I was often asked to
> work on Saturdays and sometimes was not paid

---

[58] At another point Purnell stated that she could not recall
whether he asked white employees those questions. (ECF No. 24,
Ex. 34, 199).

> for Saturdays wither.   No white employees
> were required to work without pay.

(ECF No. 26, Ex. D, 6-7).[59]  Johnson's allegations fail to raise

any inference of discrimination under § 1981 because, during her

deposition, Johnson was unable to identify a single white

telemarketer who did not have to work unpaid hours. (ECF No. 24,

Ex. 35, 70-71).[60]  None of the plaintiffs identified such a

person.

- Time cards

Johnson claims that in 2007 employees in both the back

office and the front office were writing on their time cards,

but employees in the back office were "yelled at" for doing so,

while employees in the front office (specifically, Jody Neal and

Tracy Layton) were not. (ECF No. 24, Ex. 35, 100-06).

Plaintiffs have not raised an inference of racial

discrimination.  The Court agrees with defendants' argument that

"[p]laintiffs do not point to any white telemarketer who was

treated more favorably than African Americans in this regard."

(ECF No. 24-1, 27, ¶47). Jody Neal and Tracy Layton were not

telemarketers.  Plaintiffs attempt to raise an issue of fact on

---

[59] At another point in her affidavit, Johnson stated "[b]lack employees were often required to work on Saturdays without pay." (ECF No. 26, Ex. D, 2).

[60] Johnson identified Tracy Layton as a white employee who did not have to work from home unpaid, (ECF No. 24, Ex. 35, 71) but Tracy Layton was not a telemarketer.

that point by claiming that this statement is incorrect and simply referring the Court back to Johnson's testimony. (ECF No. 26-1, 10) ("See Deposition of Latasha Johnson, Vol. 1, pgs. 131-133, Ex. I"). But Johnson never identified any white telemarketer who was not treated this way with respect to time cards—in her deposition or otherwise. Notably, telemarketers in 2007 included Crystal Murray. (ECF No. 24, Ex. 2, MSJ 530).

Further, defendants have identified a non-discriminatory reason for asking telemarketers not to write on their time cards while allowing Layton and Neal to do so.  Tracy Layton and Jodie Neal were *not required to clock in and out* while others were because "Jodie's schedule and Tracy's schedule were the same every day.  They were 8 'til 4:30.  So I felt like I did not need to keep a time clock on them anymore." (ECF No. 24, Ex. 40, 253).  By contrast, telemarketers worked more irregular days and hours and Aita found it simpler to have them clock in and out. (ECF No. 24, Ex. 40, 253).  Plaintiffs have not alleged nor presented any evidence that this reason was pretextual. No evidence suggests that it was.

- Blackberry cell phones

Purnell claims that plaintiffs were not given company Blackberry cell phones, while employees "up front" were. (ECF No. 26, Ex. 34, 147). This allegation fails to raise any inference of discrimination. Purnell was a part-time

telemarketer, and the employees "up front" worked in customer
service.  Purnell was not similarly situated with customer
service representatives up front.  As defendants note, Purnell
did not identify *any* white telemarketer who received a
blackberry phone, (see ECF No. 24-1, ¶27), let alone a part-time
telemarketer.  Plaintiffs attempt to create an issue of fact on
that point by simply rerouting the Court back to Purnell's
testimony (ECF No. 26-1, 10) ("See pg. 147 of the Deposition of
Marquito Purnell. Ex.C").  But Purnell did not identify any
white telemarketer in her deposition, or anywhere else.

    None of plaintiffs' myriad claims of disparate
terms/conditions raise any inference of racial discrimination.
No reasonable jury would find otherwise.  Moreover, the evidence
suggests that Aita did in fact respond to plaintiffs' concerns
about the workplace.  For example, Aita addressed Johnson's
complaint that Jody Neal stole her commissions by paying both
Johnson and Neal the commission. (ECF No. 24, Ex. 40, 55-56; ECF
No. 24, Ex. 36, 18).  Further, the one time that Aita recalls
being told that the telemarketing room was cold, he turned the
heat up. (ECF No. 24, Ex. 40, 83).  Similarly, Aita testified
that when Jody Neal informed him of complaints regarding
bathroom sanitary supplies, the products were replenished. (ECF
No. 24, Ex. 40, 137).  Finally, when Johnson asked Aita for a
lunch break, he told her that she could come in a half hour

early to take a half hour lunch, (ECF No. 24, Ex. 35, 132), as

other employees did in order to take unpaid lunch breaks. (ECF

No. 24, Ex. 40, 128-30; ECF No. 26, Ex. 27; Id., Ex. 28).

Accordingly, summary judgment is granted on plaintiffs'

claims of disparate terms and conditions of employment.

### 2. Discriminatory termination

Under Title VII (and thus § 1981), employers may not

"discharge any individual . . . because of such individual's

race . . . ." 42 U.S.C. § 2000e-2(a)(1). To prove a *prima facie*

case of discriminatory termination, each plaintiff must show

that: (1) she is a member of a protected class, (2) she suffered

an adverse employment action (discharge), (3) she was performing

his job duties at a level that met the employer's legitimate

expectations at the time of the adverse employment action, and

(4) her position remained open or was filled by a similarly

qualified applicant outside the protected class. Baqir v.

Principi, 434 F.3d 733, 742 (4th Cir. 2006) (internal citation

omitted).  Defendants assume for the purposes of their motion

for summary judgment that the plaintiffs can establish the first

three elements of this *prima facie* test.  (ECF No. 24-1, 41).

However, defendants maintain that plaintiffs have not satisfied

the fourth element.  (Id.).  Plaintiffs disagree, claiming that

"[w]hite telelemarketers were hired immediately following [each

plaintiff's] discharge." (ECF No. 8, 4, ¶10).  As discussed

104

fully below, with the exception of Purnell, the plaintiffs have failed to satisfy the fourth element, that is, that their positions remained open or were filled by a similarly qualified applicant outside the protected class.

Moving to the next phase of the McDonnell Douglas scheme, defendants argue that, assuming *arguendo* that plaintiffs have established *prima facie* case, they have asserted legitimate non-discriminatory reasons for each plaintiff's discharge. (ECF No. 24-1, 42; ECF No. 27-1, 14-15).   Plaintiffs counter broadly—indeed conclusorily—that those reasons were pretextual and that plaintiffs' race was a motivating and/or determinative factor in their termination. (ECF No. 8, ¶15-16).[61] Defendants maintain that plaintiffs have not proven pretext. (ECF No. 24-1, 43). The

---

[61] Without providing a citation, defendants state that "[p]laintiffs attempt to bolster their claim that the decision to terminate them was pretext by pointing to claims of disparate treatment that allegedly occurred during their employment." (ECF No. 24-1, 43).  The Court is unable to find any clear reference by plaintiffs to general disparate treatment in support of plaintiffs' more specific disparate termination claim.  The scattered nature of plaintiffs' opposition to summary judgment (ECF No. 26-1) makes it impossible to understand which arguments go to plaintiffs' disparate termination claims versus their disparate terms/conditions claims versus their hostile work environment claims.  (See ECF No. 26-1, 3-10 (setting forth the legal standard for disparate termination, and then setting forth claims of disparate terms/conditions of employment and additional claims related to hostile work environment)). If defendants are correct in their interpretation of plaintiffs' pretext argument, the Court notes that the pretext argument would carry no weight because, as discussed infra and supra, the Court finds no merit in any of plaintiff's disparate treatment claims or hostile work environment claims.

Court agrees.  Because the more specific allegations and legal arguments vary per plaintiff, the Court will analyze them separately.

**King**

In her deposition, King claims that she was terminated on several occasions—once in either 2004 or 2005, (ECF No. 24, Ex. 38, 67, 73), once in November 2007, (ECF No. 24, Ex. 38, 21, 78), and, finally, in 2010. (ECF No. 24, Ex. 38, 22).  However, plaintiffs only point to the first termination in their arguments opposing summary judgment. (ECF No. 26-1, 8; ECF No. 30, 2, ¶2). King's claim regarding that first termination is barred under the applicable statute of limitations because it occurred prior to June 1, 2007. (See Part III(B)(i)).[62] Nevertheless, the Court will analyze the other incidents of termination noted by King in her deposition.

---

[62] The Court notes nonetheless that plaintiffs' allegations as to the first termination would not have survived summary judgment. The allegations are as follows.  King claims that in 2004 or 2005, Aita fired her during a telemarketing meeting during which Aita told telemarketers that they could eat things like chips but not like hoagies while on the phone, and King asked him why he drew the distinction between those two types of food.  ECF No. 24, Ex. 38, 67, 73.  King, Johnson, Fontaine, Purnell and Murray were present for that scene.  (ECF No. 24, Ex. 38, 71). Johnson also testified that this occurred in March 2005. (ECF No. 24, Ex. 35, 53). Johnson explained that *King was rehired the very next day or the same week*. (ECF No. 24, Ex. 35, 55). Plaintiffs do not even allege anyone else—let alone a white person—was hired in the week between the termination and the re-hiring.

King claims that she was fired in November 2007 for calling someone on the "do not call list." (ECF No. 24, Ex. 38, 21, 78). Plaintiffs have not alleged, much less produced evidence, that anyone (white or minority) was hired to replace King after she was terminated.  Even if they had, Aita had a legitimate, non-discriminatory reason for terminating King: she called someone on the "do not call list." (ECF No. 24, Ex. 40, 152).  King herself testified on two occasions that that is why she was terminated. (ECF No. 24, Ex. 38, 21, 78).  Plaintiffs have not alleged, much less produced evidence, that the reason was pretextual.  In any event, King came back to work at ESW in May 2010, after Joe called her and asked her to come back. (ECF No. 24, Ex. 38, at 22, 35; Id., Ex. 39, 124; Id., Ex. 2, MSJ 530).

King was laid off less than a month later (on June 6, 2010) because "I guess his company wasn't doing too good." (ECF No. 24, Ex. 38, 22; Id., Ex. 2, MSJ 530).  She claims that Johnson told her she (King) was replaced by a white woman named "Lizzy." (ECF No. 24, Ex. 38, 22-23).[63] Again, Lizzy's real name is Anna Bauer. (ECF No. 24, Ex. 40, 265).  Anna Bauer was in fact hired on *February 26, 2010*, (ECF No. 24, Ex, 2, MSJ 530), three months *before* King was terminated.  In any case, Anna Bauer was hired to work up front as a customer service representative—not as a

---

[63] Johnson also told King that another white person was hired after King was laid off, but King was unable to recall the woman's name. (ECF No. 24, Ex. 39, 124).

telemarketer. (ECF No. 24, Ex. 2, MSJ 530). King's telemarketing "position" was therefore not filled by a "similarly qualified applicant." See Baqir, 434 F.3d at 742. Thus, King has not established a *prima facie* case of discriminatory termination with regard to her June 2010 termination.  Even if King had established a *prima facie* case as to the June 2010 termination, both defendants (ECF No. 24-1, 42; ECF No. 27-1, 14-15; ECF No. 24, Ex. 40, 260) and *King herself* (ECF No. 24, Ex. 38, 22), identified the non-discriminatory reason for termination as a downturn in business, and plaintiffs have not argued, much less produced evidence, that this was pretextual.  The non-discriminatory nature of King's termination is bolstered by the fact that Crystal Murray was terminated on the same day (June 6, 2010). (ECF No. 24, Ex. 2, MSJ 530).  No reasonable jury could find that Aita terminated King for racially discriminatory reasons.

### *Purnell*

Purnell was terminated on or about March 1, 2009. (ECF No. 24, Ex. 2, MSJ 532).  She claims that Aita laid her off. (ECF No. 24, Ex. 34, 178).  She believes that Alyssa Mullins was hired as a telemarketer in her place. (ECF No. 24, Ex. 34, 80-83, 208). Alyssa is white. (ECF No. 24, Ex. 34, 81). Alyssa was hired as a telemarketer on January 11, 2010.  Defendants argue that the significant (over ten months) time gap between Purnell's lay off

and Mullins' hiring defeats a *prima facie* showing.  However,
defendants cite no law for this proposition, and the Court's
independent research revealed none.  Defendants do not argue
that Mullins did not in fact replace Purnell.  Thus, Purnell has
established a *prima facie* case of discriminatory termination.

However, defendants have cited a legitimate business reason
for terminating Purnell at that time ("the dramatic decrease in
sales over time, despite desperate attempts to succeed").  (ECF
No. 27-1, 14).  Plaintiffs have not shown that this reason was
pretextual.  Indeed plaintiffs do not make any pretext argument
in favor of Purnell in specific.  Plaintiffs' only pretext
arguments are, again, that defendant's reason for terminating
all plaintiffs was based on or motivated by race.  (ECF No. 8,
5, ¶¶ 15-16).  This conclusory argument, as applied to Purnell,
fails entirely.  Several factors demonstrate that Aita's
decision to terminate Purnell was not race-based.  First,
Purnell herself testified that after Aita laid her off, he
"call[ed] [her] right back" and offered her the position, but
she refused. (ECF No. 24, Ex. 34, 178).  Second, the race-
neutrality of Purnell's termination is bolstered by the fact
that Purnell was originally *hired by Aita* in 2003. (ECF No. 24,
Ex. 34, 31-32).[64]  See Evans v. Techs. Applications & Servs. Co.,

---

[64] In fact, Aita hired all four plaintiffs, so this reasoning
applies against every plaintiff's pretext argument. (See ECF No.

80 F.3d 954, 959 (4th Cir. 1996) (finding a "powerful inference" against discrimination where the person accused of discrimination is the same person who decided to hire the employee).  No reasonable juror would find that Purnell was terminated for discriminatory reasons.

### *Turner*

Aita laid Turner off on or about March 1, 2009. (ECF No. 24, Ex. 2, MSJ 532),[65] reasoning that "business had slowed down." (ECF No. 24, Ex. 37, 23).  Turner claims that she was replaced by a white woman named Christina Furniss. (ECF No. 24, Ex. 125; ECF No. 30, 2, ¶1).  Johnson and Purnell told her (Turner) that Furniss was hired the same week that Turner was laid off. (ECF No. 24, Ex. 37, 125-26). However, Furniss was in fact hired on December 1, 2009. (ECF No. 24, Ex. 2, MSJ 530). Defendants argue that this nine month gap precludes Turner's *prima facie* showing of disparate termination, but, again the Court is aware of no supporting law.  What does prevent Turner from establishing a *prima facie* case is the fact that *Furniss was not hired as a telemarketer*.  Furniss was was hired to work in the front office. (ECF No. 24, Ex. 2, MSJ 530).  Thus, Turner's

---

24, Ex. 38, 19 (King); ECF No. 24, Ex. 35, 39-40 (Johnson); ECF No. 24, Ex. 37, 15 (Turner).

[65] Turner testified that she was terminated in February 2009. (ECF No. 24, Ex. 37, 28).

telemarketing "position" was not filled by a "similarly qualified applicant." See Baqir, 434 F.3d at 742.

Even if Turner had established a *prima facie* case of disparate termination, Aita has proffered a legitimate non-discriminatory reason for terminating her, and plaintiffs have not shown that this reason was pretextual. Aita explained that he terminated Turner in order to transfer her duties to Layton and Johnson, who could perform the same duties (scheduling service maintenance appointments) during the daytime, when Aita would not have to pay commission. (ECF No. 24, Ex. 40, 126-28). In support of their pretext argument, plaintiffs argue that the *real* reason Aita terminated Turner was "to conceal the fact that the Defendant and his favorite employee [Tracy Layton] had been caught by . . . Turner, by not paying her proper commissions." (ECF No. 30, 2, ¶1). Plaintiffs are likely referring to Turner's claim that Aita terminated her the day after she confronted Layton about missing commissions. (ECF No. 24, Ex. 37, 23). However, even if it is true that Aita fired Turner for the reason plaintiffs allege, that reason is unrelated to race. It may have been harsh and improper, but is was not racially discriminatory. See DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or

even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."). No reasonable juror would conclude that Turner's termination was motivated by or based on her race.

**_Johnson_**

Johnson was terminated around January 17, 2011. (ECF No. 24, Ex. 35, 28, 89). She does not claim that any white person was hired to replace her. Thus, she has not established a prima facie case of disparate termination. Even if she had, plaintiffs have not shown that Aita's proffered reason for terminating Johnson (the ultimate restructuring of the business to survive and the fact that "[t]he business of J&A does not conduct telemarketing, and therefore, the telemarketing services of Plaintiff Johnson were no longer needed, ECF No. 27-1, 14; ECF No. 24-1, 42) was pretextual. Johnson's pretext argument is limited to the following sentence: "[t]he Defendants' proffered reason for firing plaintiff Johnson, i.e., going out of business, was a pretext for race discrimination." (ECF No. 26-1, 12). That statement is a bald conclusion on the ultimate question, not evidence that a fact-finder can assess to determine pretext. In any case, what evidence there is suggests otherwise. First, many white employees, including white telemarketers, were terminated in 2010 _before_ Johnson. Those employees include Joseph Connell (white salesperson); William

Greenhawk (white salesperson); Charles Lowe (white salesperson);
George Merritt (white salesperson); Kayle Phillips (white
salesperson); Johns Serion (white salesperson); Alyssa Mullins
(white telemarketer); Keith Schilling (white service
technician); Christine Furniss (white employee in front office);
and Jody Neal (white employee in front office). (ECF No. 24, Ex.
2, MSJ 530-31; ECF No. 24-1, 24, ¶ 39; ECF No. 24, Ex. 35, 148;
Id., Ex. 36, 7-8).  Plaintiffs do not dispute this.  It is also
undisputed that ESW ceased all telemarketing efforts on or about
December 31, 2010, (ECF No. 27-1, 8), and that J&A did not need
or use telemarketers.  Based on the evidence at bar, no
reasonable juror would consider Johnson's termination based on
or motivated by race.

Because no reasonable jury would find that any plaintiff
was terminated in a discriminatory fashion, summary judgment on
plaintiffs' discriminatory termination claim is warranted.

### 3. Discriminatory promotion

To establish a *prima facie* case of disparate promotion,
plaintiffs must show: (i) that they are members of a protected
class; (ii) that they applied for promotion; (iii) that they
were qualified for the promotion; (iv) that they were denied the
promotion; and (v) that the position remained open or was filled
by similarly qualified applicants outside the protected class.
Page v. Bolger, 645 F.2d 227, 229-30 (4th Cir. 1981) (citing

McDonnell Douglas, 411 U.S. at 802 & n.13). Plaintiffs have not established a *prima facie* case of disparate promotion. Defendants have conceded that plaintiffs are members of a protected class. (ECF No. 24-1, 39).

Plaintiffs allege that defendants "unfair[ly] refus[ed] to make employment promotions available to Latasha Johnson and Marquito Purnell." (ECF No 26-1, 12). Defendants assert that King and Turner have no claims as to promotion (ECF No. 24-1, 18, ¶21), and plaintiffs do not dispute this. (See also ECF No. 24, Ex. 37, 124).

In the light most favorable to plaintiffs, Johnson asked Aita whether she could work in the front office in November 2010, when her hours were cut from 40 hours a week to 20 hours a week. (ECF No. 24, Ex. 36, 5-6).[66] This is the only evidence that Johnson submits in support of her disparate promotion claim.  The evidence does not satisfy the latter three elements needed to prove disparate promotion.  As for the second element (plaintiff sought a promotion), Johnson testified that she was *not seeking a change in title or position*, but rather location. (ECF No. 24, Ex. 36, 6).[67]  As far as the fourth element (request

---

[66] Johnson testified at another point that, although she wanted to work in the front office, she never asked Aita for a promotion to the front office. (ECF No. 24, Ex. 35, 84).

[67] Johnson perceived the front office as being less stressful. (ECF No. 24, Ex. 35, 100).

for promotion was denied), it appears that Johnson was denied her request to relocate up front (as the only time she worked in the front office was during one day in August 2010 when she received training in the front office (ECF No. 24, Ex. 36, 7)), but again, the request was not one for promotion.  The fifth element is not satisfied because plaintiffs have not shown that a non-protected person was moved up front. In fact, Johnson does not even allege that there was a space that opened up front in the first place.

Purnell claims that in 2008, an employee up front was fired[68] so Purnell asked Aita whether he was hiring for positions up front, and Aita responded in the negative.  (ECF No. 24, Ex. 34, 174-76, 179).  Purnell testified that the position was filled by a white person. (ECF No. 24, Ex. 34, 177).  However, Purnell could not identify that person, or recall when the person was hired. (ECF No. 24, Ex. 34, 182-83).  All she recalls is seeing that new employee sitting at the desk of the woman who was fired. (ECF No. 24, Ex. 34, 183). Even assuming that Purnell satisfied the second element by applying for this position,

---

[68]Purnell could not recall the employees name but stated that it was the woman who had come from PNC bank. (ECF No. 24, Ex. 34, 174, 179). At one point in her deposition, Turner referenced an employee named Tiffany who worked at PNC Bank before working at ESW. (ECF No. 24, Ex. 37, 27).  Thus, Purnell was likely referring to Tiffany.

Purnell has not provided evidence (and, indeed, does not even allege) that she was qualified for the position.  Thus, she has not met the third requirement.  Finally, Purnell has not adequately alleged that the position was filled by a white person because she has not even identified who that person is.  Such an unsubstantiated claim cannot withstand summary judgment.  Based on the evidence presented by Purnell, no reasonable jury would find that Purnell was denied promotion based on her race.

Indeed, no reasonable jury could conclude that any plaintiff was denied a promotion based on her race.  Summary judgment on plaintiffs' discriminatory promotion claim is thus warranted.

In sum, the Court has carefully evaluated each of the dozens of factual assertions made by plaintiffs, and concludes that none evinces racial discrimination.  Accordingly, the Court GRANTS defendants' motion for summary judgment on plaintiffs' § 1981 claims.

### C. Plaintiffs have failed to state a claim for breach of contract.

Even accepting the facts in plaintiffs' complaint as true, the complaint fails to state a claim for breach of contract.

Employment relationships in Maryland are presumed to be at will.  Towson Univ. v. Conte, 384 Md. 68, 79-80 (Md. 2004); Shapiro v. Massengill, 105 Md. App. 743 (Md. Ct. Spec. App.

1995) ("An employment contract is deemed at will, and therefore terminable without cause, when it does not expressly specify a particular time or event terminating the employment relationship.").  To overcome this presumption, plaintiffs must make certain, *specific allegations* to show they are entitled to relief.  Specifically, a complaint alleging wrongful termination of an employment contract should contain the following allegations:

1. The specific terms of the employment contract or the language of the contract, handbook or personnel policy which was allegedly breached by the employer
2. The availability of any contractual remedies, and if available, the plaintiff's efforts to exhaust such remedies or facts demonstrating futility
3. The date and manner of discharge or constructive discharge or facts which otherwise show that the contract was violated
4. An averment that the plaintiff was satisfying the terms of the contract

Mazaroff & Horn, Maryland Employment Law, § 3.11.  Plaintiffs have not alleged any of those elements in their complaint.  The complaint merely contains vague and broad statements such as:

[E]ach plaintiff was given *certain assurances* with respect to their compensation.

Defendant breached *its contract* with [p]laintiffs by, among other things, failing to recognize them as individuals in their workplace, failing to ensure that their supervisors and fellow workers treated them fairly, failing to pay them consistent with

> *accepted standards*, failing to pay them
> consistent with *promises made to them*,
> failing to promote them within the
> organization, and subjecting them to
> discrimination . . . .

(ECF No. 8, 6, ¶ 22-26) (emphasis added). Plaintiffs have not

alleged any of the requirements above *at all*, let alone with

particularity.  Accordingly, plaintiffs' breach of contract

claims are DISMISSED for failure to state a claim under Fed. R.

Civ. P. 12(b)(6).

Finally, while plaintiffs have styled their request for a

permanent injunction as a separate count, plaintiffs are only

entitled to injunctive relief if they prove an underlying claim,

which they have not.

## IV. Conclusion

In ruling on this motion, the Court has undertaken an arduous,

painstaking examination of the evidence in the record.  That

examination was made exceedingly more difficult by plaintiffs'

general statements of fact, untethered to a date, and unadorned

by informative detail, such as person and place.  A party is not

entitled to proceed to trial, engaging the precious time of

jurors and resources of the Court, by "throwing spaghetti

against the wall and hoping something will stick."  A nonmoving

party must show that specific, material facts exist to create a

genuine triable issue.  Matsushite Elec. Indus. Co v. Zenith

Radio Corp., 475 U.S. 574, 587 (1986).  Courts have an

affirmative duty to prevent factually unsupported claims and defenses from proceeding to trial. <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987).

Thus, for the reasons set forth above, the Court GRANTS defendants' motion for summary judgment on plaintiffs' § 1981 claims, and GRANTS defendants' motion to dismiss plaintiffs' breach of contract claim.

Date: 7/31/12                        /s/
                                Susan K. Gauvey
                                United States Magistrate Judge